IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN J. HALL and JEANETTE A. HALL, as Administrators and Personal Representatives of the ESTATE OF KARLIE A. HALL, and in their own right as Decedent's heirs-at-law, | : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 17-220 |
| v. | : : | |
| MILLERSVILLE UNIVERSITY, SARA WIBERG, Individually and as an Employee of Millersville University, ACACIA NATIONAL FRATERNITY, ACACIA FRATERNITY CHAPTER NUMBER 84, COLIN HERBINE, Individually and as an Agent of Acacia National Fraternity and Acacia Fraternity Chapter No. 84, JACK MILITO, Individually and as an Agent of Acacia National Fraternity and Acacia Fraternity Chapter No. 84, NICHOLAS HENCH, Individually and as an Agent of Acacia National Fraternity and Acacia Fraternity Chapter No. 84, SEAN EBERT, Individually and as an Agent of Acacia National Fraternity and Acacia Fraternity Chapter No. 84, NIGALE QUILES, Individually and as an Agent of Acacia National Fraternity and Acacia Fraternity Chapter No. 84; and JOHN DOES #1-5, Individually and as Agents of Acacia National Fraternity and Acacia Fraternity Chapter No. 84, | : : : : : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : | |

## **MEMORANDUM OPINION**

Smith, J.                                                                                                    September 5, 2019

This tragic case arises from a man's brutal murder of his 18-year-old girlfriend in her

university dorm room after they attended a fraternity party together. The victim's parents attribute

some responsibility for the murder to the university, the local fraternity chapter and certain of its members who hosted the party their daughter and her boyfriend attended, and that chapter's national fraternal organization. Specifically, they assert negligence claims against each of the fraternity defendants and a Title IX claim against the university. At bottom, the plaintiffs believe that each of the defendants, through their own actions, contributed to the chain of events that allowed their daughter's boyfriend to strangle her to death in the early morning hours of February 8, 2015. The defendants respond that these events, while undoubtedly heart-rending, can only legally be attributed to the boyfriend and his unforeseeable, extraordinary act of murder. Thus, they have moved for summary judgment in their favor.

While undoubtedly sympathetic to the plaintiffs' loss, the court is constrained to agree with the defendants. As to the national fraternity, the Pennsylvania Supreme Court has unequivocally held that a national fraternity is not liable under the social host doctrine for the acts of its chapters. That jurisprudence does not provide any exception for a national fraternity, like the defendant here, that took on some role in assisting the chapter return to campus after the university deactivated it, where there is no evidence that the national fraternity had the power or resources to control the chapter's day-to-day activities, including the party at issue. In contrast, the social host doctrine undoubtedly applies to the local chapter defendants who served alcohol to minors, but no proximate cause exists over such an unforeseeable, extraordinary act of violence that occurred only after the victim and her boyfriend had already left the party. Lastly, although the court would find the evidence of the university's indifference to the boyfriend's abuse sufficient to defeat summary judgment if he were a student at the defendant university, no caselaw supports extending Title IX liability to cover harassment at the hands of a student's own guest.

The court emphasizes the limited nature of its role in assessing the events at issue. The question for the court to answer is not whether everyone who played any role in the events acted ethically but only whether the facts here can establish civil liability. Ultimately, the answer to that limited question is no. Therefore, the court will grant the defendants' motions for summary judgment.

## I.     PROCEDURAL HISTORY

The plaintiffs, Jeannette A. Hall and John J. Hall, as administrators and personal representatives of the Estate of Karlie A. Hall, and in their own right as the decedent's heirs-at-law, commenced this action by filing a complaint on January 17, 2017. Compl., Doc. No. 1. The complaint asserted claims for deliberate indifference under Title IX, substantive due process violations and state-created danger under 42 U.S.C. § 1983, and a survival action against Millersville University ("Millersville" or the "University") and Sara Wiberg ("Wiberg")—the resident assistant for the dormitory where the decedent, Karlie A. Hall ("Karlie"), lived; as well as a survival action under negligence and negligence *per se* theories against Acacia National Fraternity ("Acacia"); Acacia Fraternity, Millersville Chapter ("Chapter 84" or the "Chapter"); and Chapter 84 individual members Colin Herbine ("Herbine"), Jack Milito ("Milito"), Nicholas Hench ("Hench"), Sean Ebert ("Ebert"), Nigale Quiles ("Quiles"), and John Does 1–5. *Id*. at ¶¶ 8–19, 88–154. The plaintiffs also asserted wrongful death claims against all defendants. *Id*. at ¶¶ 145–54.

Ebert, Millersville and Wiberg, and Hench filed separate motions to dismiss the complaint for failure to state a claim on February 27, 2017, March 7, 2017, and March 13, 2017, respectively. Doc. Nos. 23, 44, 45. On March 13, 2017, the plaintiffs filed a response in opposition to Ebert's motion to dismiss. Doc. No. 46. Chapter 84 and the individual member defendants filed a joint

motion to dismiss on March 20, 2017.[1] Doc. No. 55. The plaintiffs filed a response in opposition to Hench's individual motion to dismiss on March 24, 2017. Doc. No. 58. Ebert filed a reply in further support of his individual motion to dismiss on March 27, 2017. Doc. No. 59. Acacia moved to dismiss on March 28, 2017. Doc. No. 60. The plaintiffs filed separate responses in opposition to Chapter 84's (with the individual defendants) and Millersville and Wiberg's motions to dismiss on April 3 and 4, 2017, respectively. Doc. Nos. 61, 62. On April 10, 2017, Milito filed a reply to the plaintiffs' response in opposition to <u>his</u> motion.[2] Doc. No. 65. Millersville and Wiberg filed their reply to the plaintiffs' opposition on April 11, 2017. Doc. No. 68.

On April 21, 2017, the court granted the plaintiffs' motions for leave to file sur-replies to Milito's and Millersville and Wiberg's replies to their opposition briefs, which they filed on May 1, 2017. Doc. Nos. 69–72, 75. Chapter 84 (with the individual members) and Hench filed their separate replies to the plaintiffs' oppositions on April 24, 2017. Doc. Nos. 73–74. The court granted the plaintiffs' motion for leave to file a sur-reply to Chapter 84 and the individual members' reply on May 2, 2017, which the plaintiffs filed on May 12, 2017. Doc. Nos. 78, 80. The plaintiffs filed their response in opposition to Acacia's motion to dismiss on May 10, 2017. Doc. No. 79. Chapter 84 (with the individual members) and Acacia filed their responses in further support of their motions to dismiss on May 12, 2017, and June 16, 2017, respectively. Doc. Nos. 80, 83.

After oral argument on July 27, 2017, the court denied the motions to dismiss separately filed by Ebert, Hench, Chapter 84 (with its individual members), and Acacia, without prejudice to

---

[1] The moving defendants filed this motion on behalf of Hench and Ebert despite these individuals having already filed motions to dismiss the complaint.

[2] Prior to this reply, Milito did not file a motion to dismiss on his own behalf. The only motion to dismiss on his behalf was the motion filed on behalf of Chapter 84 and its individual member defendants. It is unique to have only one defendant (who appears to also have his own private counsel) out of a group of defendants who have moved to dismiss a complaint, file a reply brief to the plaintiffs' opposition to the motion to dismiss.

these defendants re-raising their arguments in motions for summary judgment. Sept. 29, 2017 Order at 2, 4, Doc. No. 87. The court also denied in part and granted in part Millersville and Wiberg's motion, dismissing with prejudice the Title IX claims against Wiberg (to which the plaintiffs did not object), the section 1983 individual liability claims against Wiberg based on qualified immunity, and the section 1983 official capacity claims against Wiberg. *Id*. at 2–3 and n.1, 2. The court further dismissed without prejudice the section 1983 claim against Millersville based on Eleventh Amendment immunity. *Id.* at 3 and n.3.

The defendants then filed separate answers to the complaint between October 11 and 13, 2017. Doc. Nos. 88–95. On October 31, 2017, the court entered a scheduling order allowing the plaintiffs to file an amended complaint to identify the fictitious defendants by March 2, 2018, Scheduling Order at 2, Doc. No. 98, but the plaintiffs declined to do so. By stipulation of the parties, the court dismissed Milito from the action on February 15, 2018, and Ebert from the action on September 4, 2018. Doc. Nos. 108, 137.

Millersville filed a motion for summary judgment on September 17, 2018. Doc. No. 147. The plaintiffs filed a response in opposition on October 17, 2018. Doc. No. 148. Acacia filed its motion for summary judgment on October 19, 2018. Millersville filed a reply in response to the plaintiffs' opposition brief on November 9, 2018. Doc. No. 151. The plaintiffs filed a response in opposition to Acacia's summary judgment motion on November 9, 2018. Doc. No. 152. The plaintiffs filed a response in opposition to Chapter 84 and the remaining individual members' (Herbine and Quiles) motion for summary judgment on November 9, 2018. Doc. No. 153. Acacia and Chapter 84 filed separate replies in further support of their summary judgment motion on

November 16, 2018. Doc. Nos. 157, 158. The court heard oral argument on the parties' briefing on November 29, 2018. The summary judgment motions are now ripe for review.[3]

## II.     FACTUAL BACKGROUND[4]

### A.     <u>Karlie Begins a Relationship with Gregorio Orrostieta, whom She Continues Dating at Millersville</u>

Karlie met and began dating Gregorio Orrostieta ("Orrostieta") in March 2014, towards the end of her senior year of high school. Millersville University's Statement of Material Facts in Supp. of its Mot. for Summ. J. ("Millersville SOF") at ¶ 1, Doc. No. 147-2; Pls.' Response to Def. Millersville University's Statement of Material Facts in Supp. of its Mot. for Summ. J. ("Pls.' Resp. to Millersville SOF") at ¶ 1, Doc. No. 148-3. Over that summer, Orrostieta regularly stayed at the Hall home. Millersville SOF at ¶ 3; Pls.' Resp. to Millersville SOF at ¶ 3. On one occasion, Karlie was in the shower when her twin sister, Kristen Hall ("Kristen"), heard Orrostieta screaming at her about text messages she had sent. Millersville SOF at ¶ 4; Pls.' Resp. to Millersville SOF at ¶ 4. At one point during the fight, Kristen heard Karlie yell, "you hit me." Millersville SOF at ¶ 5; Pls.' Resp. to Millersville SOF at ¶ 5. Kristen does not recall whether she ever discussed the fight with Karlie. Millersville SOF at ¶ 6; Pls.' Resp. to Millersville SOF at ¶ 6.

At another point that summer, Orrostieta and Karlie were locked in a room during a party at the Hall home, when Kristen heard "a lot of banging," which worried her. Millersville SOF at ¶ 8 (quoting Kristen's deposition testimony); Pls.' Resp. to Millersville SOF at ¶ 8. Kristen did not discuss the incident with Karlie or their mother. Millersville SOF at ¶ 9; Pls.' Resp. to Millersville SOF at ¶ 9. After Karlie's death, her mother learned from reviewing Karlie's Facebook messages

---

[3] The parties stipulated to dismissal of any claims against Herbine and Hench on December 7, 2018. Doc. Nos. 160, 161. Thus, the only remaining individual Chapter 84 defendant (other than the local chapter) is Quiles.

[4] Where the parties disagree about the relevant facts, the court has recited the facts in the best possible light for the plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 n.2 (1986) ("[A]ll evidence must be construed in the light most favorable to the party opposing summary judgment.").

with Orrostieta that he had physically abused her on multiple occasions. Millersville SOF at ¶ 12; Pls.' Resp. to Millersville SOF at ¶ 12.

That fall, Karlie and Kirsten started as freshmen at Millersville, with Karlie living in a dorm room in Bard Hall. Millersville SOF at ¶ 13; Pls.' Resp. to Millersville SOF at ¶ 13. She and Orrostieta continued their relationship, and he frequently visited her and stayed as her guest in her dorm room. Millersville SOF at ¶ 15; Pls.' Resp. to Millersville SOF at ¶ 15.

## B.    The October 4–5, 2014 Incident[5]

On October 4, 2014, Karlie and Orrostieta returned to her room from a party, at which time Karlie's roommate, Tina Flexer ("Tina"), noticed Karlie was crying. Millersville SOF at ¶ 18; Pls.' Resp. to Millersville SOF at ¶ 18. Karlie then left the room and went to the bathroom. Dep. of Tina Flexer ("Tina Dep.") at 46:14–23, Doc. No. 147-8. Tina left the room and ran into Karlie in the hallway, at which point she told Tina that she had had a verbal fight with Orrostieta. *Id.* at 47:5–18. Wiberg had also seen Karlie crying in the hallway, and she asked to speak to Tina in the hallway to see if she knew what was wrong. *Id.* at 49:18–21, 50:4–7; Dep. of Sara Wiberg ("Wiberg Dep.") at 60:20–61:3, Doc. No. 147-7. Tina and Wiberg were talking in the hallway when they heard Karlie and Orrostieta yelling, "rustling around [of items or furniture]," and Karlie scream "ow" from inside the room. Tina Dep. at 56:6–58:6; Sara Wiberg Oct. 5, 2014 Incident Reporting Form, Doc. No. 148-6; Wiberg Dep. at 66:6–67:13, 67:24–69:20; Millersville SOF at ¶ 19; Pls.' Resp. to Millersville SOF at ¶ 19.

Wiberg then knocked on the door. Millersville SOF at ¶ 20; Pls.' Resp. to Millersville SOF at ¶ 20. When Orrostieta answered, Karlie was in bed with her back to them. Millersville SOF at ¶ 20; Pls.' Resp. to Millersville SOF at ¶ 20. Orrostieta explained that the noises were from him

---

[5] The parties seem to agree that the party began the night of October 4, 2014, and the relevant events continued into the early morning of October 5, 2014. *See* Millersville SOF at Heading between ¶¶ 16 and 17.

trying to "force himself into bed" with Karlie, and that "things got a little physical" when Karlie "pushed him away." Millersville SOF at ¶¶ 20–21; Pls.' Resp. to Millersville SOF at ¶¶ 20–21. Wiberg testified that at one point, Orrostieta "put his hand on [Wiberg's] shoulders," and that she perceived him as trying to "shift[] the focus" when she asked why Karlie had yelled "ow." Pls.' Resp. to Millersville SOF at ¶¶ 20–21; Wiberg Dep. at 56:14–15, 79:14–21.

Wiberg testified that when she approached Karlie, she saw her face was "red and puffy" as if she had been crying, but she did not see any physical injuries. Millersville SOF at ¶ 22; Pls.' Resp. to Millersville SOF at ¶ 22. Tina testified she and Wiberg both observed an injury to Karlie's eye and that they got an ice pack to put on Karlie's face. Pls.' Resp. to Millersville SOF at ¶ 22; Tina Dep. at 124:5–20. Karlie then told Wiberg that she wanted Orrostieta to leave but would not say anything else. Millersville SOF at ¶ 23; Pls.' Resp. to Millersville SOF at ¶ 23. In the hallway, Orrostieta begged Wiberg to allow him to stay, but as Karlie had said she wanted him to leave, he could no longer be her guest, so Wiberg called the police. Millersville SOF at ¶ 24; Pls.' Resp. to Millersville SOF at ¶ 24.

Officer Brian Liddick of the Millersville University Police responded to a call for "subject refusing to leave campus." Millersville SOF at ¶¶ 25, 26; Pls.' Resp. to Millersville SOF at ¶¶ 25, 26. Officer Liddick drove Orrostieta to a nearby gas station, where a friend had agreed to pick him up. Millersville SOF at ¶ 27; Pls.' Resp. to Millersville SOF at ¶ 27. Wiberg created an Incident Report, which she submitted to Assistant Director of Judicial Affairs Ron Wiafe. Millersville SOF at ¶ 29; Pls.' Resp. to Millersville SOF at ¶ 29. Officer Liddick did not create an incident report until after the murder. Millersville SOF at ¶ 28; Pls.' Resp. to Millersville SOF at ¶ 28.

Tina returned to the dorm room later and spoke to Karlie about the incident. Millersville SOF at ¶ 30; Pls.' Resp. to Millersville SOF at ¶ 30. Karlie kept her back to Tina, but Tina

eventually saw that "there was something weird with her eye" and it "was really red." Millersville SOF at ¶ 30 (quoting Tina Dep. 61:1–19); Pls.' Resp. to Millersville SOF at ¶ 30. Karlie told Tina that Orrostieta had "pushed with the heel of [his] hand on her eye" and "push[ed] her down into the pillow." Millersville SOF at ¶ 31; Pls.' Resp. to Millersville SOF at ¶ 31.

## C. Tina's Description of the Incident to Her Mother and Her Mother's Subsequent Calls to Millersville

Tina called her mother, Renea Flexer ("Renea"), to describe the incident the next day, because she was concerned about Karlie and believed that Orrostieta may have hit her. Millersville SOF at ¶ 36; Pls.' Resp. to Millersville SOF at ¶ 36. Renea called the Millersville University Police, the Millersville Counseling Department, and Area Coordinator Allie Sehl to report that her daughter told her that her roommate's boyfriend had given her a black eye, but they all said there was nothing they could do without a complaining witness. Millersville SOF at ¶ 37; Pls.' Resp. to Millersville SOF at ¶ 37. Tina testified that Karlie rarely left her room during the week following the incident and skipped class on the Monday. Pls.' Resp. to Millersville SOF at ¶ 39 (citing, *inter alia*, Tina Dep. 146:22–147:9; Crim. Trial Testimony of Tina Flexer, Apr. 26, 2016, at 1312:6–12).[6]

## D. Karlie and Orrostieta Attend a Fraternity Party at Acacia Chapter 28 on February 7–8, 2015

From the night of February 7, 2015, to the early morning hours of February 8, 2015, Karlie and Orrostieta attended a party with a group of friends, including Karlie's sister, Kristen. Millersville SOF at ¶ 51; Pls.' Resp. to Millersville SOF at ¶ 51. Members of one of Millersville's fraternities, Acacia Chapter 84, hosted the party at their house, which was decorated with Acacia paraphernalia and symbols and known locally as the "Acacia House." Acacia Fraternity Chapter

---

[6] Karlie suffered another unexplained eye injury in late-January, 2015, Millersville SOF at ¶¶ 43–50; Pls. Millersville SOF at ¶¶ 43–50, but that injury could not be tied to Orrostieta and is irrelevant to the court's analysis.

Number 84, Colin Herbine and Nigale Quiles' Statement of Material Facts in Supp. of Their Mot. for Summ. J. ("Chapter 84 SOF") at ¶ 8, Doc. No. 149-2; Pls.' Resp. to Acacia Frat[ern]ity Chapter Number 84, Colin Herbine and Nigale Quiles' Statement of Material Facts in Supp. of Their Mot. for Summ. J. ("Pls.' Resp. to Chapter 84 SOF") at ¶ 8, Doc. No. 153-2. Witnesses testified that Karlie and Orrostieta purchased cups at the party for $5, which would allow them to consume alcohol while there. Pls.' Resp. to Chapter 84 SOF at ¶ 10.

After arriving at the party, one member of Karlie's friend group, Kyle Smith ("Smith"), witnessed Orrostieta "viciously" yell at Karlie, point his finger in front of her face, and then "push her into the wall pretty hard" before walking away. Chapter 84 SOF at ¶ 11; Pls.' Resp. to Chapter 84 SOF at ¶ 11. Smith testified that he was between five and ten feet away from Karlie and Orrostieta at the time, and he could not hear what Orrostieta was saying to Karlie but could tell from his demeanor that he was yelling. Pls.' Resp. to Chapter 84 SOF at ¶ 11; Dep. of Kyle Smith ("Smith Dep.") at 52:15–53:14, 88:15-23, Doc. No. 152-8. He did not know whether anyone else witnessed the altercation and did not tell any members of Chapter 84 what he had seen, including any of the "sober brothers" who were tasked with monitoring the party. Chapter 84 SOF at ¶ 11; Pls.' Resp. to Chapter 84 SOF at ¶ 11. A Chapter 84 member, Adam Krull ("Krull"), testified that, if an "assault"[7] were to occur in the basement, "more than likely somebody would have s[een] it."[8] Dep. of Adam Krull ("Krull Dep.") at 147:17–18, Doc. No. 153-13. Smith further testified that he made sure to check on Karlie before he left the party, and after he saw her and Orrostieta dancing together he assumed "everything's good." Chapter 84 SOF at ¶ 12; Pls.' Resp. to Chapter 84 SOF at ¶ 12.

---

[7] The attorney who deposed Krull did not explain the term "assault" to Krull.
[8] The plaintiffs assert in their statement of facts, "[w]hen this assault occurred, it would have been observed by those sober brothers assigned to patrol the party." Pls.' Resp. to Chapter 84 SOF at ¶ 11 (citing Krull Dep.). For the reasons discussed in detail in the Chapter 84 liability section, that is an inaccurate representation of Krull's testimony.

### E.     Orrostieta Murders Karlie in Her Dorm Room

After Karlie and Orrostieta returned to Karlie's dorm room, Karlie's neighbors reported to Wiberg that they heard furniture being moved in Karlie's room. Millersville SOF at ¶ 52; Pls.' Resp. to Millersville SOF at ¶ 52. Another student in a room next door reported to the police after the murder that he and a friend heard a "loud bump" that shook the wall, which was loud enough that another neighbor knocked on his friend's door to ask whether they had heard the noise as well. Voluntary Statement of Gerald Sanders, Doc. No. 148-17. They all then "heard the girl screaming for help." *Id.* Wiberg knocked on the door but heard nothing and did not pursue the matter further. Millersville SOF at ¶ 53; Pls.' Resp. to Millersville SOF at ¶ 53. Orrostieta had killed Karlie through "strangulation and multiple traumatic injuries," and he potentially sexually assaulted her. Millersville SOF at ¶ 54; Pls.' Resp. to Millersville SOF at ¶ 54 (quoting Postmortem Report, Doc. No. 148-18). He was later convicted of third-degree murder. Millersville SOF at ¶ 56; Pls.' Resp. to Millersville SOF at ¶ 56.

### F.     Chapter 84's Relationship with its National Fraternal Organization

Acacia is an Illinois non-profit corporation headquartered in Indianapolis, Indiana, which operates as a men's collegiate fraternity. Acacia Fraternity, Inc.'s Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. or, Alternatively, for Partial Summ. J. ("Acacia SOF") at ¶ 22, Doc. No. 150-2; Pls.' Resp. to Acacia Inc.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. or, Alternatively, for Partial Summ. J. ("Pls.' Resp. to Acacia SOF") at ¶ 22, Doc. No. 152-2. Acacia currently has approximately 30 local undergraduate chapters at various colleges and universities across the United States and Canada, with 1100 active undergraduate members and seven full-time paid staff. Acacia SOF at ¶ 22; Pls.' Resp. to Acacia SOF at ¶ 22. Acacia issues charters to local chapters, and these charters allow the local chapters to use its name,

traditions, rituals, and insignia. Acacia SOF at ¶ 23; Pls.' Resp. to Acacia SOF at ¶ 23. Like most national fraternities, Acacia has a Risk Management Policy, which states that it "shall apply to all fraternity entities and all levels of fraternity membership." Acacia SOF at ¶ 23 (citing Decl. of Patrick McGovern at ¶ 4, Doc. No. 150-3); Pls.' Resp. to Acacia SOF at ¶ 23 (quoting Dep. of Patrick McGovern ("McGovern Dep.") at 95:15–96:1, Doc. No. 152-10, and citing McGovern Dep. at 88:15–90:10, 123:21–124:14). Acacia is an educational self-governance organization, and each chapter "ha[s] exclusive jurisdiction over local affairs, except as provided for by the *Laws of Acacia*." Acacia SOF at ¶ 24 (citation and internal quotation marks omitted); Pls.' Resp. to Acacia SOF at ¶ 24. Acacia's International President—the chief executive officer of the fraternity responsible for chapter inspections and matters pertaining to chapter members—oversees the International Council, which, in turn, oversees the Executive Director—who manages the daily operations of the international headquarters, chapter operations and expansions, membership records, leadership consultants, and office staff. Pls.' Resp. to Acacia SOF at ¶ 24.

Acacia does not have any staff on location at any of the local chapters to monitor daily activities and cannot influence the individual chapters other than by imposing discipline after a violation. Acacia SOF at ¶ 26; Pls.' Resp. to Acacia SOF at ¶ 26. Regarding Chapter 84, Acacia assisted the chapter in getting back on campus after it was deactivated in 2011 for, among other infractions, hosting a party where attendees, some of whom were underage, paid $5 for a cup to consume alcohol. Pls.' Resp. to Acacia SOF at ¶ 26. Chapter 84 was also on a debt repayment plan with Acacia, which required it to provide Acacia with monthly written updates regarding its overall operations. *Id*. Chapter 84 was back in good standing at the time of Karlie's death. Acacia SOF at ¶ 27; Pls.' Resp. to Acacia SOF at ¶ 27.

### III. DISCUSSION

### A. Standard of Review – Motions for Summary Judgment

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of

a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'"

and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.     Acacia

### 1.     Existence of a Duty

Generally, a social host in Pennsylvania who serves alcohol to an intoxicated person is not liable for any damages that intoxication causes, whether to the intoxicated person herself or to a third-party. *See Klein v. Raysinger*, 470 A.2d 507, 510–11 (Pa. 1983) ("We agree with this common law view, and consequently hold that there can be no liability on the part of a social host who serves alcoholic beverages to his or her adult guests."). Under this social host doctrine,[9] however, an exception applies where the intoxicated person is a minor. *See Congini by Congini v. Portersville Valve Co.*, 470 A.2d 515, 518 (Pa. 1983) ("Thus, we find that defendants were negligent per se in serving alcohol to a person less than twenty-one years of age, and that they can be held liable for injuries proximately resulting from the minor's intoxication." (footnotes omitted)). The duty not to serve alcohol to minors extends both to the minors themselves and to third parties whom the intoxicated minors may harm. *See Orner v. Mallick*, 527 A.2d 512, 523–24 (Pa. 1987) (reversing lower court dismissal of minor's personal injury claims against social host who served him alcohol); *Douglas v. Schwenk*, 479 A.2d 608, 610–12 (Pa. Super. 1984) (holding

---

[9] "The social host doctrine is a general phrase used to designate a claim in negligence against a person (the host) who provides alcoholic beverages to another (the guest), without remuneration, where the guest then sustains injuries, or causes injury to a third person as a result of his intoxicated condition." *Kapres v. Heller*, 640 A.2d 888, 889 n.1 (Pa. 1994).

estate of passenger killed in accident with intoxicated minor driver could sue party who served minor alcohol).

In *Alumni Association v. Sullivan* ("*Sullivan*"), the plaintiff sought to extend the Social Host Doctrine established in *Congini* to hold that a national fraternity had a duty to "monitor the activities of its Chapters," and was therefore responsible for damage an intoxicated minor caused after being served alcohol at a chapter house. 572 A.2d 1209, 1211 (Pa. 1990). In that case, a minor who set fire to a neighboring house sought to file a joinder complaint against the university, as well as the national fraternity and fraternity chapter where he had consumed alcohol earlier in the night. *Id.* at 1209–10. The Court held that the national fraternity had no duty to the party guest, even though it purportedly owned the property where the party occurred, because there were "no allegations the fraternity had actual knowledge of the activities allegedly occurring at the local chapter or of the ability of the national body to control said activities." *Id*. at 1211. The *Sullivan* Court based its decision not to extend liability to the national organization on two different factors: first, the fraternal nature of the relationship between individual chapters and the national organization and second, the national chapter's inability to contemporaneously monitor and control its chapters' activities. The court reasoned,

> By definition such organizations are based upon fraternal, not paternal relationships. National organizations do not have the ability to monitor the activities of their respective chapters which would justify imposing the duty appellant seeks. The national organization in fraternal groups has only the power to discipline an errant chapter after the fact. It does not possess the resources to monitor the activities of its chapters contemporaneously with the event. Fraternal organizations are premised upon a fellowship of equals; it is not a relationship where one group is superior to the other and may be held responsible for the conduct of the other. From this factual matrix, there is no basis in the relationship to expand the liability of the national body to include responsibility for the conduct of one of its chapters.

*Id.* at 1213.

The *Sullivan* Court agreed with the Third Circuit's logic in *Fassett v. Delta Kappa Epsilon (New York)*, 807 F.2d 1150 (1986), and *Macleary v. Hines*, 817 F.2d 1081 (1987), that to qualify as a social host, the defendant must have "intentionally and substantially aided and encouraged the consumption of alcohol by a minor guest . . . ." *Id.* at 1212 (quoting *Macleary*, 817 F.2d at 1084). Social hosts are those who "participated in the planning and the funding of social events where alcohol was consumed by minors [and were] . . . aware of the degree of consumption by the minors." *Id.* (citing *Macleary*, 817 F.2d at 1084; *Fassett*, 807 F.2d at 1162–63). Applying this standard, the *Sullivan* Court held that neither the university nor the national fraternity were social hosts, because "there [we]re no allegations that either the fraternity or the University was involved in the planning of these events or the serving, supplying, or purchasing of liquor." *Id.* at 1213.

The Superior Court of Pennsylvania applied *Sullivan* to reach a similar conclusion in *Millard v. Osborne*, 611 A.2d 715 (1992). In that case, the estate of a minor who was killed in a motorcycle accident after consuming alcohol at a fraternity house sued the college, which then joined the national fraternity. 611 A.2d at 715–16. The plaintiff argued that "the national fraternity rendered substantial assistance in consumption of alcohol by a minor in that it counseled the chapter how to conduct parties and avoid civil liability," *id.* at 719, but the court rejected this argument, in part because "the national fraternity counsel[ed] *against* the use of alcohol." *Id.* (citing national fraternity resolution requiring consumption and distribution of alcohol to be consistent with all applicable regulations, policies, and law). The plaintiff pointed to the fact that "the national fraternity counseled the chapter to avoid potential liability by not having 'open' parties, [but e]ven this statement indicate[d] that the national fraternity counseled *away* from access to alcohol by suggesting that the chapter never have any open parties, where alcohol access was unrestricted." *Id.* The fact that the chapter ultimately allowed underage drinking on its property

was not the point; it was that the national fraternity had not encouraged—and, indeed, affirmatively discouraged—them from doing so. Likewise, the court recognized that "the national fraternity [wa]s not in a position to control the actions of its chapters. . . . In addition to the lack of geographic proximity which would defeat any attempt at day-to-day control, we note our supreme court [in *Sullivan*] has unequivocally stated that a National Fraternal Organization is not under a duty to control the activities of its members." *Id.* at 719–20.

The plaintiffs do not dispute that *Sullivan* held that national fraternities are not liable under the Social Host Doctrine but argue that this case is distinguishable because, here, Acacia chose to engage with Chapter 84 more closely than in a typical national fraternity-local chapter relationship. *See* Pls.' Mem. of Law in Support of its Mot. Opposing Acacia Fraternity Inc.'s Mot. for Summ. J. or, Alternatively, for Partial Summ. J., ("Acacia Opp.") at 9, Doc. No. 152-1 ("What should be taken from this statement by the Pennsylvania Supreme Court [in *Sullivan*] is that [] *typically* a national entity does not have the ability to monitor the activities of their chapters[.]"). Specifically, the plaintiffs assert that Acacia's decision to work with Chapter 84 after its 2011 deactivation meant that it "assumed a duty to ensure no harm came from Chapter 84's conduct and concurrently assumed the role of principal in an agency relationship that will see them vicariously liable for Chapter 84's misconduct." *Id.* at 4.[10]

But nothing in either *Sullivan* or *Millard* invites the case-by-case inquiry into the relationship between each individual chapter and its national entity that the plaintiffs seek.[11] In

---

[10] The plaintiffs further argue that a genuine issue of material fact exists for the jury to decide as to whether Acacia assumed a duty to Karlie, Acacia Opp. at 18, but "[t]he existence of a duty is a question of law for the court to decide." *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005) (citations omitted); s*ee also Port Auth. of N.Y. and N.J. v. Arcadian Corp.*, 189 F.3d 305, 320 (3d Cir. 1999) ("As we have seen, the existence of a duty is properly a question for the court.").

[11] The plaintiffs cite to *Kenner v. Kappa Alpha Psi Fraternity, Inc.'s* holding, repeating the language of *Sullivan*, that "[i]t is clear that the Court [in *Sullivan*] limited its holding to the factual matrix of the case . . . ." Acacia Opp. at 9 (quoting 808 A.2d 178, 182 (Pa. Super. 2002)). But the *Kenner* court described the relevant factual matrix as an "invitation to expand social host liability to fraternal organizations" and decided that analysis was inapplicable in a

*Sullivan*, the Court held that "[t]he national organization in fraternal groups has only the power to discipline an errant chapter after the fact," not merely that the particular defendant had no such power. 572 A.2d at 1213. And even if the *Sullivan* Court had permitted a more focused inquiry, there is no evidence here that Acacia had the sort of power over or knowledge of Chapter 84's day-to-day activities that would have allowed it to prevent or otherwise control the party on February 7–8, 2015. To illustrate the point further, the national fraternity in *Millard* likewise "counseled" its chapters to avoid open parties with open-source alcohol and service to minors, including through a policy in relevant part identical to the Risk Management Policy here. 611 A.2d at 719 n.4. But the fact that the national entity implemented such a policy that the individual chapter disregarded, in violation of the national entity's rules, did not warrant a different result.

The plaintiffs here seem to argue that unlike in *Millard*, Acacia had reason to know that Chapter 84 was not complying with the Risk Management Policy because of the 2011 party that led to its deactivation and updates it received from Chapter 84 in the months before Karlie's death. Specifically, they point to Chapter 84 member Kevin Mynaugh's ("Mynaugh") statement in a monthly report to Acacia for August/September 2014 that the Chapter "fe[lt] as a Fraternity that the way we had been running things w[as] not safe for us as a Fraternity and the people who were involved outside of the Fraternity." Acacia Opp. at 14 (quoting Acacia Fraternity Millersville Chapter; Monthly Report ("Chapter 84 Monthly Report"), Doc. No. 152-26). But the *Sullivan* Court explicitly rejected the plaintiff's argument that a social host may be held liable if it "knew or *should have known*" minors were being served alcohol, holding instead that "[t]he 'knowingly furnished' standard requires actual knowledge on the part of the social host as opposed to imputed knowledge imposed as a result of the relationship." 572 A.2d at 1212. It is not enough to suspect

case not addressing the Social Host Doctrine. 808 A.2d at 182. This case, in contrast, involves the same "factual matrix" because the plaintiffs also seek to impose liability under the Social Host Doctrine.

that minors are being served alcohol; rather, the defendant "must have 'intentionally and substantially aided and encouraged the consumption of alcohol by a minor guest . . . .'" *Id.* (quoting *Macleary*, 817 F.2d at 1084)). Like the defendants found not to be social hosts in *Sullivan*, *Fassett*, and *Maclearly*, Acacia played no role "in the planning of [the party] or the serving, supplying, or purchasing of liquor." *Id.* at 1213. Nor did Acacia "substantially aid[ or] encourage" Karlie's, Orrostieta's, or any other party guest's liquor consumption; to the contrary, like the national fraternity in *Millard*, it specifically counseled and instituted a policy against such activities. Thus, the plaintiffs' attempt to distinguish the facts here from those in *Sullivan* and the related precedent are unavailing.[12]

Perhaps recognizing this flaw in their argument, the plaintiffs also argue that "whether Acacia in fact knew of the risk management policy violations is of no moment because of the degree of control they were exerting over Chapter 84." Acacia Opp. at 17. But no evidence supports that statement. The plaintiffs point to no deposition testimony or documentary evidence

---

[12] The court notes that, contrary to the plaintiffs' assertions, the evidence does not actually demonstrate that Acacia knew or had reason to know about the party at issue or that liquor would be served to minors there. Immediately after the excerpt of the report that the plaintiffs cite, Mynaugh stated, "[t]o combat this we have organized a list for social gatherings to insure that these gather[ing]s are invite-only and we have done away with Kegs which go against our insurance plan." Chapter 84 Monthly Report. The plaintiffs claim that

> [a]nyone reading these reports would of course understand that Chapter 84 was admitting to not checking identifications for social events (and by implication furnishing alcohol to minors), hosting open parties without specific invitations, and throwing parties with kegs [which] . . . would be in violation of [Acacia's] mandatory Risk Management Policy[.]

Acacia Opp. at 14–15 (citations omitted). But even assuming that was true, the report demonstrates that in the fall of 2014, several months before Karlie's murder, Chapter 84 was representing to Acacia that it would no longer have open parties with open-source alcohol. The plaintiffs assert, "it strains credulity to suggest that Acacia, having assumed the obligation of repeated contacts to hold Chapter 84 accountable, was not aware of the risk management policies being broken." Acacia Opp. at 17. But they cite to no evidence to support that assertion beyond the party that led to Chapter 84's deactivation three years before and the monthly report, which again, represents that Chapter 84 would cease participating in such activities months before Karlie's murder. *See NTP Marble, Inc. v. AAA Hellenic Marble, Inc.*, Civ. A. No. 09-5783, 2012 WL 607975, at *4 (E.D. Pa. Feb. 27, 2012) ("[T]here must be more than mere allegations in a memorandum of law to place credibility in issue and preclude summary judgment. Specific facts must be produced." (citation omitted)). Regardless, an argument that Acacia "should have known" that Chapter 84 was serving alcohol to minors is insufficient under *Sullivan*.

showing that Acacia had the power to monitor Chapter 84 contemporaneously (as opposed to the monthly reports received after the fact) or to dictate how the Chapter conducted itself day-to-day. To the contrary, Acacia's representative's deposition testimony demonstrates that Acacia would provide feedback, advice, and reminders to help Chapter 84 "hold themselves accountable" for their actions. *See* McGovern Dep. at 115:25–116:2 ("We don't – Acacia Fraternity, Incorporated doesn't work to ensure that [parties are] invite-only. That would be something, you know, that the Chapter is doing."); *see also id.* at 116:12–21 ("We don't have oversight and control to that extent, and also -- I mean, in general, when Chapters are coming to us and saying, 'We want to -- we recognize maybe we could be doing some things differently here,' we tend to want to work with them, encourage them, and work along that way, instead of going back and . . . punishing or something like that for things they did in the past that they realized should have been done differently."). Equally problematic, the plaintiffs do not cite any caselaw holding that a national fraternity becomes liable for all harms stemming from chapter misconduct if it exercises some level of control over the respective chapter, and the court has not found any such precedent in its own research. Certainly, the Pennsylvania Supreme Court dictated no such result in *Sullivan*.

In the alternative, the plaintiffs argue that Acacia assumed a duty pursuant to Section 877 of the Restatement (Second) of Torts. Acacia Opp. at 9. That section states,

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he: . . .
> (d) controls, or has a duty to use care to control, the conduct of the other, who is likely to do harm if not controlled, and fails to exercise care in the control, or
> (e) has a duty to provide protection for, or to have care used for the protection of, third persons or their property and confides the performance of the duty to the other, who causes or fails to overt harm by failing to perform the duty.

Restatement (Second) of Torts § 877. Assuming here that Chapter 84's conduct towards Karlie was tortious, as to subsection (d), again, the evidence does not show that Acacia controlled Chapter

84. The plaintiffs point to evidence that Chapter 84 provided monthly reports to Acacia, in connection with a debt repayment plan, and that Chapter 84 would include information about its risk management practices in those reports. Acacia Opp. at 2–3 (quoting McGovern Dep.). But that evidence demonstrates that, if anything, Acacia worked with Chapter 84 to provide regular check-ins, advice, and feedback, not that Acacia controlled the Chapter's day-to-day activities. *Id.* Nor does the evidence suggest that Acacia had the power to contemporaneously discipline Chapter 84 for any failure to comply with its Risk Management Policy. As the plaintiffs acknowledge in their brief, McGovern explicitly testified, "we can't ensure or control the things that these guys [in Chapter 84] are doing on a daily basis . . . . We do the best we can. We try to educate on why not and this is the reason why, and then we have to [respond] when violations happen." *Id.* at 2–3 (quoting McGovern Dep. at 119:19–25); *see also id.* at 13 ("I would say encouraging and helping to hold accountable. You know, 'Hey, this is coming up. Have you done this thing that we talked about last week when we talked?' Just keeping things that they need to take care of top of mind." (quoting McGovern Dep. at 143:23–144:2)). No part of this testimony suggests that these monthly reports bestowed upon Acacia "the resources to monitor the activities of its chapters contemporaneously with the event," *Sullivan*, 572 A.2d at 1213, and there is certainly no evidence that Acacia had contemporaneous knowledge of the party on February 7–8, 2015. Likewise, as to subsection (e), there is no evidence—or caselaw—that suggests in offering advice and assistance to Chapter 84, Acacia somehow took on a duty to protect third party guests at Chapter 84's parties. Restatement (Second) of Torts § 877(e).

The plaintiffs suggest that the Allegheny County Court of Common Pleas' holding that section 877 applied in *M.L. v. University of Pittsburgh*, 26 Pa. D. & C.4th 106 (1995), *abrogated on other grounds by Elias v. Lancaster General Hospital*, 710 A.2d 65 (Pa. Super. 1998), supports

such a holding here, but that case involved a wholly different set of facts and theory of liability. *M.L.* held the chapter of the fraternity, "whose premises were used for the [party and was thus] a 'possessor of land' within the meaning of section 314A(3)," was potentially liable for its members' and their guests' sexual assault of the plaintiff on fraternity property. 26 Pa. D. & C. 4th at 111. The court explicitly distinguished *Sullivan* on the grounds that the national fraternity was not a defendant: "The Supreme Court balanced the cost to universities and the national fraternal organizations (who are not defendants herein) with what it perceived were 'relatively rare, regrettable incidents' and concluded that 'the increased cost which would enure to such bodies could seriously impede the mission of these institutions . . . .'" *Id.* at 113 (quoting *Sullivan*, 572 A.2d at 1213). Thus, *M.L.* is inapplicable to the plaintiffs' claim against Acacia.

The plaintiffs also argue that Section 323 of the Restatement (Second) of Torts applies here. Acacia Opp. at 10–11. Section 323 provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to performing his undertaking, if
>   (a) his failure to exercise such care increases the risk of harm, or
>   (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323. The plaintiffs do not provide any analysis about how section 323, which is generally considered part of the Good Samaritan Rule, *see Patentas v. United States*, 687 F.2d 707, 710 (3d Cir. 1982) (describing appellants' second argument, under section 323, as being "based on the familiar tort doctrine of good samaritan liability"), is at all applicable here. More importantly, section 323 cannot "be invoked to create a duty where one does not exist." *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 (Pa. 1983) (citations omitted). Moreover, the plaintiffs' argument is that Acacia undertook to provide services to Chapter 84, and thus any

duty arising from section 323 would run to Chapter 84 or its members, not to unidentified third parties like Karlie.[13]

Lastly, the plaintiffs argue that the court must conduct the balancing test established in *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000) to determine whether a duty exists, as the Superior Court of Pennsylvania did in *Kenner*, 808 A.2d at 182. Acacia Opp. at 18-23. In *Kenner*, the plaintiff sued multiple defendants, including a national fraternity, for serious injuries he suffered during a hazing ritual. 808 A.2d at 180. The Court of Common Pleas dismissed the national fraternity from the action under *Sullivan*, but the Superior Court reversed, holding the case was distinguishable because it did not involve the Social Host Doctrine. *See id.* at 182 ("As this case does not involve the Social Host Doctrine, *Sullivan* does not bind us in the present matter."). The court then applied the *Althaus* test, under which the court balances, "'(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.'" *Id.* (quoting *Althaus*, 756 A.2d at 1169). The *Kenner* court concluded that the *Althaus* factors supported imposing a duty in that case, because (1) the plaintiff paid the national entity an application fee and signed a membership agreement, creating a contractual relationship between the parties; (2) it was undisputed that a national fraternity should seek to prevent hazing; (3) the plaintiff's injuries were foreseeable to the national fraternity, because pledges at other chapters had previously suffered similar injuries or even died from hazing;[14] (4) the consequences of imposing a duty would be

_____
[13] Not surprisingly, the plaintiffs do not cite to any cases in which a court held that section 323 applied to a fraternity. Another court in this district rejected a plaintiff's argument that the defendant university was liable under section 323 for injuries she suffered after drinking at a fraternity party in *Booker v. Lehigh University*, 800 F. Supp. 234, 237 (E.D. Pa. 1992).

[14] As to the foreseeability point, the plaintiffs represent that "[t]he facts underling the 2011 incident [that led to Chapter 84's deactivation] are strikingly similar to the case at bar: members of Chapter 84 hosted an 'Acacia party' at a house decorated with 'Acacia fraternity paraphernalia,' where individuals were charged $5 for a cup that granted them

minor, because the national fraternity had already taken steps to protect pledges by banning hazing; and (5) there was a substantial public interest in preventing individuals from dying or suffering serious injury to become a member of a fraternity. *Id*. at 182–83. But this case, unlike *Kenner*, undoubtedly involves the Social Host Doctrine, and so *Sullivan*, not *Althaus*, controls.

Even if *Sullivan* did not control, this court disagrees with the plaintiffs' assessment that the *Althaus* factors warrant a holding that a national fraternity owes third parties a duty to protect them from another third party's intentional bad acts off fraternity property. First, unlike in *Kenner*, neither Karlie nor the bad actor (in *Kenner*, the fraternity members who hazed the plaintiff; here, Orrostieta) had any relationship, contractual or otherwise, with Acacia. Karlie and Orrostieta attended a party where members of Chapter 84 lived, which they had decorated with Acacia paraphernalia and symbols. There is no evidence, or even an allegation, that any employee of the national organization attended (or even knew of) the party, nor is there any allegation that the $5 entrance fee Karlie paid was then distributed to the national organization. Second, there is social utility to a national organization providing guidance to its members on how best to avoid underage and/or binge drinking, which would be undermined if providing such guidance would render the national entity a social host liable for all the chapter's misconduct.[15] Third, recognizing the inherent risks of underage and binge drinking, as discussed further below, it was not at all foreseeable that a minor would murder another minor with whom he was in a romantic relationship after drinking at a fraternity party. Fourth, holding Acacia liable here could have serious

---

unfettered access to three kegs of beer. Not surprisingly, individuals under the legal drinking age were permitted entry and furnished alcohol. Apparently, the only difference between this 2011 party and the February 2015 party preceding Karlie's death was that the police responded and interrupted the party." Acacia Opp. at 11–12 (internal citations omitted). Of course, there is no reason to believe that if police had not interrupted the party, it would have ended with one party guest murdering another. Thus, the facts here are critically different than those in *Kenner*, in which the national fraternity knew that hazing at other chapters had led to pledges' serious injuries and even deaths. 808 A.2d at 179.

[15] Of course, even the plaintiffs do not contest that, under *Sullivan,* a national entity that provided no such guidance would be immune from suit.

consequences, as it would mean that national organizations could face potentially limitless liability for harms suffered off campus exclusively between non-fraternity members where the local chapter violated the national fraternity's rules, even if the national entity had no contemporaneous knowledge of the fact. Fifth, the public interest in preventing underage and binge drinking—and the potential harms that could result—is in conflict with the public interest in not imposing excessive costs on institutions, like fraternities, that the Pennsylvania Supreme Court recognized "serve a vital role in the development of our youth." *Sullivan*, 572 A.2d at 1213. Thus, upon balancing all the factors, this court concludes that, even if applicable, *Althaus* would not support imposing a duty here.

The plaintiffs propose this court adopt a standard—unrecognized by any Pennsylvania court—that a national fraternal organization may be liable for harms a third-party guest suffers at the hands of another third-party off fraternity property, merely because the national organization engaged in regular communications with the local chapter about its risk management practices on some general level.[16] The court cannot do so without some guidance from a Pennsylvania court supporting such an extension of the current law.

### 2. Proximate Cause

Even if Acacia had a duty to Chapter 84's party guests, the facts here would not support a finding of proximate cause. If no reasonable jury could find that proximate cause existed, taking

---

[16] Although the bulk of the plaintiffs' argument is focused on Acacia's role in assisting Chapter 84 to get back on campus after its 2011 deactivation, they also suggest that the holdings in *Sullivan* and *Millard* potentially should not apply to small fraternities at all. *See* Acacia Opp. at 16 ("Beyond that, Acacia is not by any means a massive national fraternal organization. There are a mere twenty-nine chapters and three leadership consultants employed to service those chapters. Each consultant is responsible for [fewer] than ten chapters. Based on what is outlined above, this case simply cannot be lumped in with the facts of Sullivan or Millard."). Nothing in either of those decisions suggests that courts should evaluate the size of or resources available to the national fraternity in deciding whether to impute liability. Instead, the Pennsylvania Supreme Court held that the relationship between national fraternities and their "respective units" is "totally antithetical to the heightened duty [the plaintiffs] importuned [the Court] to accept." *Sullivan*, 572 A.2d at 1213; *see also Millard*, 611 A.2d at 720 ("[W]e note our supreme court has unequivocally stated that a National Fraternal Organization is not under a duty to control the activities of its members.").

all facts in the best possible light to the plaintiff, the court must decide the issue itself. *See Heeter v. Honeywell Int'l, Inc.*, 706 F. App'x 63, 66 (3d Cir. 2017) ("Because we hold that a jury could not reasonably differ as to whether [the defendant]'s conduct proximately caused [the plaintiff's] harm in this case, the District Court did not err in deciding the issue itself.").

In Pennsylvania, courts use the Restatement (Second) of Torts' "substantial factor" test to determine whether proximate cause exists. *Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977) (citing to Restatement (Second) of Torts § 431). When determining whether negligent conduct is a substantial factor in producing the injury,

> [t]he following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]
> (c) lapse of time.

Restatement (Second) of Torts § 433 ("section 433"). Whether a third party's conduct breaks the chain of causation depends on whether the conduct amounted to a superseding cause, or a mere intervening force. "A superseding cause is an act of a third person or other force which, by its intervention, prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Von der Heide v. Com., Dep't of Transp.*, 718 A.2d 286, 288 (Pa. 1998) (quoting Restatement (Second) of Torts § 440 and citing *Trude v. Martin*, 660 A.2d 626, 632 (Pa. Super. 1995)). To determine whether a subsequent occurrence is an intervening or superseding cause, courts consider "whether the force is operating independently of any situation created by the first actor's negligence and whether it is a normal result of that situation." *Trude*, 660 A.2d at 632 (citations omitted). Not every third-party criminal act is a

superseding cause. "[T]he proper focus is not on the criminal nature of the negligent act, but instead on whether the act was so extraordinary as not to be reasonably foreseeable." *Powell v. Drumheller*, 653 A.2d 619, 624 (Pa. 1995).

In *Heeter*, the Third Circuit applied section 433 to affirm the district court's holding that there was no proximate cause where the plaintiff alleged that the failure of the alarm system she purchased from the defendants allowed an intruder to steal firearms from her home, which he then used to murder her son in a different location. 706 F. App'x at 65. The plaintiff told the defendants when discussing potentially purchasing an alarm system that she was concerned about a neighbor, the eventual intruder and murderer, who had a "tortured past" and a "conscious disregard for the well-being of others and in particular, her son, Bryan Harris." *Id.* (quoting case record). In response, the defendants confirmed that the alarm system would alert her immediately if there was a break-in, and the plaintiff agreed to purchase the system. *Id.* Despite those assurances, the neighbor was able to break into the home, disable the alarm, and steal the plaintiffs' firearms, without the plaintiff receiving any notification. *Id.*

The Third Circuit agreed that all three section 433 factors weighed against the existence of proximate cause. First, "myriad other matters[—all relating to the decisions the murderer had made—]had a far greater effect on the murder of Harris than the conduct of the [defendants]." *Id.* at 67; *see also Van Mastigt*, 393 Pa. Super. at 151 ("None of the defendants put a knife in [the murderer's] hand. None of the defendants were responsible for the act of killing [the victim]. A court determined that [the murderer] alone was responsible for the actual murder of [the victim].")." Second, "[t]he chain of events on the day of Harris's murder did not begin with the faulty alarm system." 706 F. App'x at 67. Finally, the passage of time between the failure of the alarm system and the murder although "not dispositive on its own, . . . work[ed] in concert with the other two

considerations to negate proximate cause in this case." *Id.* (citing *Am. Truck Leasing, Inc. v. Thorne Equip. Co.*, 583 A.2d 1242, 1243–44 (Pa. Super. 1991)). In addition to these factors, the court noted that the neighbor's conduct "was not foreseeable and constitute[d] a superseding cause. Intervening criminal action is not *per se* superseding, but becomes so when, 'looking retrospectively from the harm through the sequence of events by which it was produced, it is so extraordinary as not to have been reasonably foreseeable.'" *Id.* (quoting *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1237 (Pa. 1983) and citing *Powell*, 653 A.2d at 624).

In holding proximate cause did not exist over the plaintiff's claims in *Heeter*, the district court relied on the Superior Court's holding in *Brown v. Philadelphia College of Osteopathic Medicine*, 760 A.2d 863 (2000), which this court likewise finds applicable here. In that case, the defendant hospital misdiagnosed the plaintiffs' baby with syphilis, which led to the wife discovering her husband's infidelity, the couple frequently fighting, the husband physically abusing the wife, and the wife losing her job as a police officer after firing a gun at the husband. 760 A.2d at 865–67. The court held that it was "abundantly clear" that preexisting problems in the plaintiffs' relationship "had a far greater effect in producing the harm" than the erroneous test result. *Id.* at 869. The fact that the hospital's incorrect test results exacerbated those relationship problems did not change that result.

The plaintiffs cite to cases which they assert demonstrate that "Pennsylvania courts have long held that violence and injury, and even criminal misconduct, are foreseeable consequences stemming from the service of alcohol." Acacia Opp. at 24 (citing *Corcoran v. McNeal*, 161 A.2d 367 (Pa. 1960) (imposing liability on bar owner for injuries suffered during attack on bar premises during which bar staff repeatedly ignored requests for help); *Schelin v. Goldberg*, 146 A.2d 648 (Pa. Super. 1958) (holding bar was subject to Dram Shop liability for overserving patron who

caused plaintiff injuries in bar fight); *Rommel v. Schambacher*, 11 A. 779 (Pa. 1887) (imposing liability on bar owner who saw patron light other patron on fire and "did not interfere to protect his guest from so flagrant an outrage");[17] *Cassaro v. Zodiac Tour and Travel Inc.*, 4 Pa. D. & C.4th 132, 138–39 (Lackawanna Ct. Com. Pl. Oct. 10, 1989) (holding proximate cause existed for claims relating to fatal car accident intoxicated minor driver caused); *Walsh v. Murphy*, 40 Pa. D. & C. 3d 98, 102 (Bucks Ct. Com. Pl. 1982) (imposing liability on tavern for stabbing injuries sustained in bar fight, based on duty as landowner, knowledge of bad actor's prior threats with knife, and Dram Shop liability); *Arnold v. Lemon*, 20 Pa. D & C.3d 751 (Columbia Ct. Com. Pl. 1981) (allowing tavern patron to seek damages from tavern for injuries sustained in bar fight because fight was not "highly extraordinary"). But the matter at hand does not ask whether the defendants should be held liable for a drunken bar fight on their own property or for a drunk driving accident. To the contrary, the plaintiffs seek to hold the defendants liable for Orrostieta's brutal murder of their daughter away from the party a significant period of time after they left. None of the cited cases support such a holding.

Nor does the plaintiffs' argument that "all parties seemingly agree that drinking, and underage drinking in particular, is risky behavior and/or can lead to violence, injury or death," Acacia Opp. at 26–27, change the analysis.[18] Certainly, individuals, and especially minors, who

_____

[17] The plaintiffs also cite to New Jersey caselaw. *See Steele v. Kerrigan*, 148 N.J. 1, 14–15 (1997) (assessing how to apportion fault between minor tortfeasor and tavern under New Jersey Licensed Alcoholic Beverage Liability Act); *State v. Kelly*, 97 N.J. 178, 194 n.5 (1984) (discussing connection between alcohol and family violence in criminal case about whether expert testimony on battered-woman's syndrome was admissible in murder trial, with no discussion of civil liability for serving alcohol); *State v. Stasio*, 78 N.J. 467, 476–77 (1979) (assessing effects of alcohol on criminal intent with no discussion of civil liability causation).

[18] The plaintiffs assert that "McGovern and all members of Chapter 84 deposed in this case agree that the service of alcohol can be risky and/or lead to violence, injury, or death." Acacia Opp. at 28. McGovern denied during his deposition that drinking alcohol would increase the risk of violence, stating instead that "[w]hat [he] would say is that a person who is, you know, abusive is maybe likely to be abusive again." McGovern Dep. at 184:24–185:4. He further testified, in reference specifically to Karlie's decision to drink, that drinking alcohol can be "risky behavior." *Id.* at 182:1–4. Chapter 84 member Jesse DiVento agreed during his deposition that "violence and fights and things like that," in addition to unspecified "death and injury [and] countless things," could result from alcohol consumption. Dep. of Jesse DiVento at 45:21–46:2, Doc. No. 152-19. Member Adam Krull likewise agreed during his deposition

drink to excess suffer an increased risk of harm. But this is not a case about a drunk driving accident, or a bar fight, or even a sexual assault at a fraternity house. This is a case about an abusive boyfriend who, after months of physical and psychological abuse, cruelly, brutally, and senselessly murdered his girlfriend, who had seemingly been a victim of his violent temper throughout their relationship.

Applying the factors the court described in *Trude*, first, Orrostieta's abuse "operat[ed] independently" from Acacia's and Chapter 84's purported conduct, because his abusive behavior began months before the party. The plaintiffs argue (albeit in their response to Chapter 84's motion for summary judgment) that even though Orrostieta had been violent toward Karlie, that violence did not reach the level of murder until after the February 7–8 party. *See* Pls. Mem. of Law in Support of its Mot. Opposing Acacia Frat[ern]ity Chapter Number 84, Colin Herbine and Nigale Quiles' Mot. for Summ. J. ("Chapter 84 Opp.") at 1–2, Doc. No. 153-1 ("Evidence has been developed through this litigation that Orrostieta physically abused Karlie while he was intoxicated and that this physical abuse steadily escalated. Orrostieta, however, had never raped and murdered Karlie until the flagrant and egregious violations of the law and mandatory risk management policies by [Chapter 84] provided the spark for him to explode."). But as the plaintiffs acknowledge, Orrostieta's abuse was steadily increasing in its severity, and there is nothing, other than their conclusory allegation, to suggest that it was something about the alcohol at the Chapter

---

that alcohol could make someone "rowdy and [] violent." Krull Dep. at 46:23–47:3. Member Tyler Ward testified that alcohol could cause someone "to get into a car accident and injure somebody that way. Or somebody could, like, fall into somebody, that way." Dep. of Tyler Ward at 75:18–22, Doc. No. 153-9. He further testified that "[s]omeone could get into a fight, but [he] d[id]n't know if that specifically is – if you could say that's specifically from the alcohol." *Id.* at 76:12–15. Lastly, Mynaugh denied that he learned at a university event that "serving alcohol to minors could lead to violence." Dep. of Kevin Mynaugh at 34:7–11, Doc. No. 153-21. He then agreed that "service of alcohol to [a] minor can lead to violence just as much as it can also lead to violence if it's somebody above the age of 21." *Id.* at 35:22–36:6. Thus, these witnesses testified to the general dangers of consuming alcohol, such as car accidents or fights, but none of them testified that they would have expected the sort of crime that occurred here to result from drinking.

84 party which caused Orrostieta to "explode" in a way he had not done before. Of course, there has also been no evidence introduced that any member of Chapter 84 knew Orrostieta, let alone knew of his violent tendencies, which would have arguably made it foreseeable to them that he could become abusive if intoxicated.

Second, murder is not the "normal result" of underage drinking. Every weekend on college campuses across America, countless students face the risks of underage binge drinking, which includes the "normal," if often tragic, risks of alcohol poisoning, car accidents, slip and falls, and even sexual assault. But no reasonable finder of fact could include murder on that list. Indeed, as with the murderer in *Heeter*, Orrostieta's own decision to beat and strangle Karlie on February 8, 2015 was so extraordinary and so beyond the realm of any consequence a reasonable person would anticipate from underage drinking, that no reasonable factfinder could disagree that it was a superseding cause that breaks the chain of causation.

Of course, the plaintiffs here do not seek damages for harms that a party guest suffered on fraternity property or at the hands of fraternity members. Such distinct facts may very well call for a different result. *See Heeter*, 706 F. App'x at 67 ("Had the harm to Harris occurred near the Heeters' residence, which ADT was contracted to protect, the question of proximate cause might well have been one for a jury to decide. Harm inflicted this far from the residence is another matter."). But isolated to these particular facts—where the crime took place off fraternity property, entirely between non-fraternity members, after a party of which the national fraternity had no knowledge—the court cannot conclude that the law supports imposing liability here despite the tragic events which occurred.[19]

---

[19] The plaintiffs devote part of their briefing in response to Acacia's motion for summary judgment to describing Orrostieta's purported conduct towards Karlie at the party. Acacia Opp. at 21–22. Of course, Acacia—which did not know about the party—would have no way to know about any of this activity.

### 3.    Vicarious Liability

The plaintiffs acknowledge that "Pennsylvania courts have not determined whether a national fraternity may be held liable on the basis of an agency relationship," and invite this court to allow such a theory of liability to move forward here. Acacia Opp. at 30–36. As a federal court sitting in diversity over causes of action that are the within the fundamental provenance of the state, this court declines to do so. If anything, *Sullivan* and *Millard* suggest that the Pennsylvania Supreme Court would not agree that a fraternity chapter acts as the agent of the national entity. As the *Sullivan* court recognized, fraternities are "[b]y definition . . . organizations [that] are based upon fraternal, not paternal relationships." 572 A.2d at 1213. Although the plaintiffs allege that Acacia, unlike the national fraternity in *Sullivan*, exercised control over Chapter 84, as discussed above, no reasonable finder of fact could agree that the evidence supports such a conclusion.

In support of their argument, the plaintiffs point to the facts that a chapter member is considered to be a member of Acacia, students and fraternity members referred to the house where the party was held as the "Acacia house," Chapter 84 decorated the house with Acacia paraphernalia, chapters paid Acacia dues, Acacia had a general oversight body, and Acacia had a Risk Management Policy that applied to its chapters. Acacia Opp. at 31–32. But the plaintiffs make no effort to show that any of these features are unique to Acacia and Chapter 84, as opposed to any fraternity and its local chapters. *See, e.g.*, *Abraham v. Alpha Chi Omega*, 781 F. Supp. 2d 396, 401 (N.D. Tex. 2011) (discussing general practice of fraternity and sorority members displaying Greek letters of their organizations); *Fiacco v. Sigma Alpha Epsilon Fraternity*, No. Civ. 1:05-145-GZS, 2006 WL 890686, at *2 (D. Me. Mar. 31, 2006) ("The national fraternity establishes the dues, fines and fees structure for its local chapters."); *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 163 (Ind. 2014) ("There is no designated evidentiary material that shows that the national fraternity

had a right to exercise direct day-to-day oversight and control of the behavior and activities of the local fraternity and its members. Like *Yost* [*v. Wabash College*, 3 N.E.3d 509 (Ind. 2014)], the specific duty undertaken in regards to the policies on hazing and underage and irresponsible drinking was an educational one without any power of preventative control."); *Rogers v. Sigma Chi Int'l Fraternity*, 9 N.E.3d 755, 765 (Ind. Ct. App. 2014) ("Rogers correctly notes there were fraternity 'letters and memorabilia' inside the house, as was the fraternity checkbook, but he offers no argument or explanation why these amounted to manifestations '*from the agent's principal*', that could give rise to apparent agency." (internal citations omitted)); *Stein v. Beta Rho Alumni Ass'n, Inc.*, 621 P.2d 632 (Or. App. 1980) (declining to impose vicarious liability even though "dues of the local fraternity were paid to the national fraternity in Oxford, Ohio [and t]he national fraternity set the rules and regulations for the local fraternity."). Indeed, the national fraternity defendant in *Millard* counseled against the use of alcohol and had a policy that forbid illegal alcohol consumption, but the court did not even discuss whether such considerations were relevant to an agency analysis. 611 A.2d at 719 & n.4.[20] The plaintiffs point to the specifics of chapter funding and national leadership to warrant a different result, but they point to no caselaw in the Greek life context that suggests those considerations are at all relevant. Acacia Opp. at 33. This is especially true as to their apparent agency theory, as they do not purport to have any evidence to suggest that Acacia took any action as to Karlie to lead her to believe that Chapter 84 was its agent. *See Turner Hydraulics, Inc. v. Susquehanna Constr. Corp.*, 606 A.2d 532, 534 (Pa. Super. 1992) ("Apparent authority exists where a principal, *by words or conduct*, leads people with whom the

---

[20] In the Court of Common Pleas, the national fraternity sought dismissal from the case, in part, based on the fact "[t]hat the members of the local fraternity [we]re not agents of the national fraternity, nor d[id] they have authority to act on behalf of the national fraternity." *Millard v. Osborne*, 12 Pa. D. & C. 4th 637, 641 (Crawford Ct. Com. Pl. 1991).

alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise." (citation omitted)).[21]

## C.    Chapter 84

### 1.    Proximate Cause

Like Acacia, Chapter 84 contends that, as a matter of law, their purported conduct could not be the proximate cause of Orrostieta murdering Karlie. Mem. of Law in Supp. of Acacia Fraternity Chapter Number 84, Colin Herbine and Nigale Quiles' Mot. for Summ. J. ("Chapter 84 Br.") at 8, Doc. No. 149-1 ("[T]he Restatement (Second) states specifically that in that specific situation, if the harm is intentionally caused (such as third degree murder) and is not within the scope of risk created by the negligent conduct then the defendant is relieved of liability." (citing Restatement (Second) of Torts § 422B; *Ford*, 379 A.2d at 115)).[22] The plaintiffs assert in response that "[t]he question here is not the foreseeability of murder but rather the foreseeability of harm." Chapter 84 Opp. at 10. In support of that argument, they cite to *Trude*, in which the Superior Court held, "the peculiar way in which an injury may result is not material so long as there was a foreseeable probability of injury to one within the ambit of danger." 660 A.2d at 632–33 (citation omitted); *see also Ford*, 379 A.2d at 114 ("'If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent

---

[21] Having held that Acacia cannot be vicariously liable for Chapter 84's conduct, the court need not assess Acacia's argument that, if the court found a principal-agent relationship, any illegal conduct (like serving alcohol to minors) would fall outside the scope of the agency relationship.

[22] The plaintiffs also respond to Chapter 84's argument that proximate cause does not exist over harms by a third-party's intentional misconduct by suggesting that the murder was unintentional. *See* Chapter 84 Opp. at 24 ("Third degree murder is not an intentional killing but one committed with malice. First degree murder, on the other hand, is an intentional killing." (internal citation omitted)). To clarify, "the absence of specific intent to kill is not an element of third degree murder; rather, such crime is an intentional act, characterized by malice, that results in death, intended or not." *Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013). Applied here, Orrostieta may not have specifically intended that his attack on Karlie would result in her death, but he did certainly intend to beat and strangle her, ultimately resulting in her death.

of the harm or the manner in which it occurred does not prevent him from being liable.'" (quoting *Churbuck v. Union R.R. Co.*, 110 A.2d 210 (Pa. 1955) (quoting Restatement of Torts § 435(1))).

In *Trude*, the plaintiff sought damages from the owner of a restaurant after he fell from a brick wall with a loose capstone. 660 A.2d at 628. The restaurant owner argued that another man's illegal act of pushing the plaintiff from the wall broke the chain of causation, but the court rejected that argument, reasoning that although the man's push was an intervening force, "the consequences of this act were not so extraordinary or unforeseeable as to render it a superseding cause." *Id.* at 632 (citation omitted). Likewise, in *Ford*, the Pennsylvania Supreme Court rejected the defendant's argument that his negligent failure to maintain his property, ultimately leading to a fire that spread to the plaintiff's property, was not proximately related to the plaintiff's harm "simply because the actual physical force that started the fire [wa]s unknown . . . ." 379 A.2d at 114. The Court quoted the Comment to the Restatement (Second) of Torts Section 442B,

> any harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk, is always 'proximate,' no matter how it is brought about, except where there is such intentionally tortious or criminal intervention, and it is not within the scope of the risk created by the original negligent conduct.

*Id.* at 115 (quoting Restatement (Second) of Torts § 422B cmt. B). The plaintiffs interpret this caselaw as holding that because violence, injury, and death generally are foreseeable consequences of consuming alcohol, proximate cause exists over Orrostieta's conduct and Karlie's corresponding death, even if Chapter 84 could not have predicted the precise nature of that violence or death.

But precedent does not support such a seemingly limitless interpretation. In *Reilly v. Tiergarten Inc.*, 633 A.2d 208 (Pa. Super. 1993), the Superior Court of Pennsylvania held that the defendants' negligent provision of alcohol to the minor plaintiff under the Dram Shop Act was not the proximate cause of injuries the minor suffered after being shot by police. After consuming

alcohol that all three defendants provided, the plaintiff walked home, where he got in an argument with his father, which culminated in him pulling a knife, cutting himself, and shoving his father into a fireplace. *Id*. at 209. When the police arrived, the plaintiff refused to surrender the knife, and they were forced to shoot him, causing severe and permanent injuries. *Id*. The court agreed with the defendants that the plaintiff's own intentional, violent actions were so remote from the service of alcohol that proximate cause did not extend to his injuries. *Id*. at 210.

The plaintiffs acknowledge that *Reilly* "involve[d] an injury that [wa]s far removed from the service of alcohol both temporally and geographically," but then offer only a conclusory statement that "[w]hile the criminal act [here] occurred in a geographically different place it was hardly remote and the chain of events is clearly more direct when compared to *Reilly*." Chapter 84 Opp. at 14. The court cannot agree with the plaintiffs' distinction. First, like in *Reilly* (and unlike in all the cases the plaintiffs cite), the confrontation that caused the underlying harm did not occur at the location where Karlie and Orrostieta consumed alcohol, but only after they returned home to Karlie's dormitory. Also like in *Reilly*, the plaintiffs do not suggest that any defendant had any additional involvement with Karlie or Orrostieta after they left the party. Millersville SOF at ¶¶ 51–54; Pls. Resp. to Millersville SOF at ¶¶ 51–54. Second, regardless of any factual distinctions, *Reilly* disproves the plaintiffs' argument that proximate cause always exists over cases involving violence, injury, or death, simply because individuals (like the deposed Chapter 84 members) recognize that alcohol consumption poses a general risk of their occurrence. Certainly, there are situations in which serving alcohol, especially to minors, exposes the consumer to risks for which the provider must be held responsible. Car accidents and bar fights undoubtedly fit within that framework. Likewise, this court agrees with the Court of Common Pleas' analysis in *M.L.* that a

rape at a fraternity party perpetuated by fraternity members is a foreseeable result of underage binge drinking. 26 Pa. D. & C.4th at 112.

But, as prior courts have recognized, the law draws the line at a third party's extraordinary criminal behavior. *Powell*, 653 A.2d at 624 ("Instead, the proper focus is not on the criminal nature of the negligent act, but instead on whether the act was so extraordinary as not to be reasonably foreseeable."); *Trude*, 660 A.2d at 632 ("[T]he consequences of this act were not so extraordinary or unforeseeable as to render it a superseding cause."). The plaintiffs argue that the *Reilly* decision "want[s] of any substantive analysis." Chapter 84 Opp. at 13. But the court agrees with the Superior Court and with the Acacia and Chapter 84 defendants—and, indeed, even the plaintiffs, *see* Acacia Opp. at 24 (stating wrongful intervening act "does not become a superseding cause unless, looking retrospectively from the harm through the sequence of events by which it was produced, it is so extraordinary as not to have been reasonably foreseeable." (quoting *Trude*, 660 A.2d at 632; *Rabutino v. Freedom State Realty Co., Inc.*, 809 A.2d 933, 942 (Pa. Super. 2002)))—that there must be a line at which point a third-party's intentional, extraordinary misconduct cuts off the chain of causation.[23] Otherwise, a social host could face seemingly limitless liability for a guest's action, no matter how horrendous or unforeseeable, even after that guest leaves the party. The court agrees with the defendants that the law cannot possibly call for such a result. Ultimately, the court need not decide precisely where that line falls, because no caselaw suggests that causation exists over a third-party's murder at an entirely new location.[24] As the plaintiffs' themselves state,

---

[23] The plaintiffs rely on the same cases involving the foreseeability of bar fights as in their Acacia brief. Those cases are all distinguishable for the reasons discussed above. They likewise reference Chapter 84 members' testimony about the relationship between alcohol and violence, which the court also discusses above.

[24] Courts have found proximate cause over harms a plaintiff suffers from a car accident involving an intoxicated minor driver. *See Cassaro*, 4 Pa. D. & C.4th at 138 ("[I]ntoxicated minors are likely to operate motor vehicles while under the influence, creating a foreseeable risk of harm to life and property." (citing *Alumni Ass'n v. Sullivan*, 535 A.2d 1095 (Pa. Super. 1987)). To put it another way, drunkenly operating a motor vehicle does not act "independently" of being served alcohol and could be considered a "normal result" of that service. *Trude*, 660 A.2d at 632. As discussed above, the same is not true for an intoxicated minor murdering his girlfriend.

"the viciousness and depravity of [Orrostieta's] conduct here was extraordinary." Chapter 84 Opp. at 18 (citation omitted). Certainly, this court agrees. And it is the extraordinary nature of that conduct that breaks the chain of causation.

The plaintiffs suggest that Chapter 84 "created an atmosphere where injury was an inevitability," Chapter 84 Opp. at 18, but they point to no caselaw that suggests that either a business or a social host are responsible for intentional crimes an intoxicated minor or adult commits at an entirely different location, and no reasonable jury could conclude that murder was an inevitable result of a fraternity party. Certainly, individuals—especially minors—expose themselves to risk when consuming alcohol, and we, as a society, are generally aware of the nature of those risks. A drunk driving accident? Certainly. A drunken fight at the party? Absolutely. A rape on fraternity property? Sadly, yes. But an intentional killing hours later in an entirely separate location? Neither case law nor our collective experience as a society supports such a conclusion. The plaintiffs would make social hosts liable for any injury suffered after serving a minor or an intoxicated person, no matter how remote, unpredictable, or conscious-shocking. The law dictates no such result.

## 2. Whether a Genuine Dispute of Material Fact Exists Over Whether any Chapter 84 Member Knew Orrostieta Shoved Karlie and Whether that Changes the Foreseeability Analysis

In addition to their argument about the well-recognized dangers of alcohol, the plaintiffs argue that the murder was particularly foreseeable here because a reasonable factfinder could conclude that a Chapter 84 member witnessed Orrostieta shove Karlie. First, the court considers

---

Similarly, the plaintiffs point to the Superior Court's decision that the minor's setting fire to a neighboring property was reasonably foreseeable in *Sullivan*. 535 A.2d at 1100. The court noted "[t]he propensities of alcohol consumption to create aggressive, combative, and often reckless behavior," and saw "no meaningful distinction between the conclusion reached by the *Congini* Court, i.e., that intoxicated minors are likely to operate motor vehicles under the influence, creating a foreseeable risk of harm to life and property, and the likelihood that intoxicated minors will damage property through other means." *Id*. Here, Orrostieta's actions were not merely aggressive, combative, or reckless, as in a bar fight; they were willfully vicious, cruel, and shocking in a way no one could have predicted.

whether plaintiffs have produced evidence sufficient to challenge the credibility of the Chapter 84 member's testimony that they did not witness any altercation at the party. Second, the court considers whether that fact makes any difference to the legal analysis.

At the summary judgment stage, "[w]hen a witness's credibility is critical to supporting the necessary findings of fact, the District Court must consider whether there are sufficient grounds for impeachment that would place the facts to which he testifies in legitimate dispute." *El v. SEPTA*, 479 F.3d 232, 237 (3d Cir. 2007) (citation omitted); *see also NTP Marble*, 2012 WL 607975, at *4 ("[T]here must be more than mere allegations in a memorandum of law to place credibility in issue and preclude summary judgment." (citation omitted)). Here, no Chapter 84 member—or indeed, any individual other than Smith—testified that he witnessed any altercation between Karlie and Orrostieta. Krull testified, "[w]e didn't notice any issues at the party on February 7th to the 8th," Krull Dep. at 53:16–20, and that Chapter 84 "didn't even know [Karlie] was there until the media broke." *Id.* at 59:2–4.[25] Ward likewise testified that he remembered people showing him pictures of Karlie and Orrostieta shortly after the murder and "th[ought] to [him]self that [he] hadn't seen them before ever." Ward Dep. at 91:21–24. The plaintiffs suggest, given the circumstances of the party and the shove, that a reasonable trier of fact could disbelieve the Chapter 84 members' testimony that they did not observe any altercation between Karlie and Orrostieta:

> [Smith] described how Orrostieta "viciously" berated [Karlie] in a basement filled with college students drinking. He described having a clear line of sight while he stood by the keg and DJ. This area of the basement, according to Krull, would have been adjacent to the staircase where party[]goers and Chapter 84 members entered the basement or left to go upstairs. The basement was "well-lit" according to another member of Chapter 84.

---

[25] DiVento testified that he was not at the party that night. DiVento Dep. at 24:4–5. Mynaugh likewise testified that he "wasn't there" and was "not really aware of the facts of the party." Mynaugh Dep. at 15:8–10.

Chapter 84 Opp. at 21–22 (citing responsive statement of facts and deposition testimony). And yet, despite the purported obviousness of Orrostieta's assault on Karlie, they did not identify any other witness who claimed to have seen the incident. Counsel asked Smith specifically during his deposition whether he knew if anyone else saw the altercation. Rather than testify that one of the several other people in the basement must also have seen it, given the conditions of the party, he testified that, to his knowledge, he was the only one. Smith Dep. at 70:14–17. Smith further testified that it was a single shove, "just, like, one quick whatever." *Id*. at 70:18–71:5.[26] Smith did not tell any Chapter 84 members what he had seen, *id*. at 56:23–57:2, nor has anyone ever told him that they also observed the altercation. *Id*. at 63:16–19.[27]

The one other piece of evidence the plaintiffs rely on for their assertion that a Chapter 84 member must have seen the altercation is Krull's deposition testimony, which they cite for the proposition that "[w]hen th[e] assault occurred, it would have been observed by those sober brothers assigned to patrol the party." Pls.' Resp. to Chapter 84 SOF at ¶ 11 (citing Krull Dep. at 143:3–147:18). But Krull's testimony established no such fact. First, counsel asked Krull whether it would be "fair to say that if [an assault] did happen, that it *most likely* would have been witnessed by one of the brothers, either a sober brother who was monitoring the floor, or a brother who was just participating at the party?" Krull Dep. at 143:3–9 (emphasis added). Krull answered, "[i]f there wasn't a clear sight line to them, there's probably a space where it could have happened." *Id*. at 143:15–17. He then described a corner of the basement that was blocked by either a gas heater

---

[26] The court intends in no way to minimize the gravity of Orrostieta's conduct. A man shoving his girlfriend, or any woman for that matter, is, beyond any dispute, abusive and unjustifiable. The sole reason the court raises this point is to show that Smith's testimony, far from undermining the credibility of the Chapter 84 members' testimony that they did not witness the altercation, further supports that he was the only one (other than Karlie) who noticed Orrostieta's inappropriate behavior.

[27] Tina testified that earlier in the year at a different party, Orrostieta had behaved unusually in searching for Karlie. Tina Dep. at 42:19–43:14. In contrast to the altercation at the February 7–8, 2015 party, multiple people noticed and began "mocking" him. *Id*. The fact that no one, other than Smith, responded in any way to the shove lends further credence to the Chapter 84 members' testimony that no one else witnessed the altercation.

or an air cooler. *Id.* at 143:19–144:4. Counsel then asked, "[i]f it was in any other section of the basement, you would *typically* be able to see it?" to which Kull answered "[i]t would have been flagged, yeah, *if we saw it.*" *Id.* at 144:8–12 (emphasis added). After describing the layout of the basement further, Krull testified, "[b]ut there's plenty of people there. If it happened -- if something happened, somebody would have, you know, *more than likely* somebody would have saw [sic] it." *Id.* at 147:14–18 (emphasis added).

Krull never testified that a sober brother necessarily would have witnessed the altercation between Karlie and Orrostieta. Rather, he testified that if an assault occurred, "more than likely somebody would have saw [sic] it." *Id.* In asking these questions, counsel did not describe the duration, severity, or nature of the altercation that actually occurred (and Krull himself recognized that "assault's a very broad term," that covers a wide range of conduct, Krull Dep. at 43:22–44:5, so there is no way to know whether Smith's "quick whatever" description would have changed Krull's answer. Regardless, he only testified that someone (whether a partygoer or a member) *likely* would have witnessed it, and Chapter 84 would have done something if they did. The plaintiffs have not identified the time when the altercation occurred, which Chapter 84 members would have been in the basement at that time, where the members would have been in relation to Orrostieta and Karlie and which direction they would have been facing, or whether any members in the area could have been distracted by one of the other dozens of people in the basement at the time.[28] Their argument is that a jury should be permitted to speculate that one of the Chapter 84 members lied under oath during his deposition solely because Krull testified that "somebody" likely would have seen an "assault" of unspecified severity and duration. The law does not allow such a result. Thus, this evidence in no way discredits the testimony of the Chapter 84 members

---

[28] Krull testified that during a typical Chapter 84 party, there would be between 25 and 30 people in the basement. Krull Dep. at 30:9-13.

that none of them witnessed or otherwise knew about the altercation (testimony that is consistent with Smith's testimony that he did not know of anyone else who witnessed the altercation and did not tell any Chapter 84 member about it), and no reasonable trier of fact could reach a different conclusion.

Moreover, even if the Chapter 84 members had witnessed the shove, that would not have made Karlie's later murder in a different location foreseeable. The plaintiffs argue that *Rabutino v. Freedom State Realty Co., Inc.*, 809 A.2d 933 (Pa. Super. 2002), "is no different [from this case] when it comes to the dangerous atmosphere that existed and the violent act preceded by a confrontation that would have been seen by many." Chapter 84 Opp. at 20. To the contrary, *Rabutino* could not be more different than the facts here. In that case, a minor partygoer shot and killed the plaintiff's son in a race-based fight at a hotel. 809 A.2d at 935–36. The plaintiff attributed her son's death, in part, to the defendants', the hotel management and security companies, failure to intervene in the party. *Id*. at 936. The Superior Court held that the shooting death was foreseeable to the defendants, where employees of the hotel "heard gunshots audible throughout the hotel being fired out of hotel windows prior the incident in question and . . . retrieved several of the bullet casings outside of the hotel." 809 A.2d at 940 n.5 (citing deposition testimony). Indeed, a deponent "described the fearful state of mind of fellow [hotel] employees and another lodger who refused to go on the fifth floor." *Id*. (citation omitted). Thus, the plaintiff's shooting death was undeniably foreseeable to the defendants, as they knew intoxicated minors not only were carrying, but actively shooting, guns.[29] And again, the intentional bad act in *Rabutino*, unlike here and in *Reilly*, occurred while the plaintiff was still on the defendant's property.

---

[29] In contrast, the Appellate Division of the Superior Court of New Jersey dismissed negligence claims against a fraternity for injuries the plaintiff suffered when he was shot at a fraternity party, reasoning that "there was no evidence showing that it was reasonably foreseeable that plaintiff would have been shot by a third party while attending the fraternity event." *Peguero v. Tau Kappa Epsilon Local Chapter*, 106 A.3d 565, (N.J. Super. App. Div. 2015).

Here, in contrast, Smith testified that he sought to assist Karlie immediately after the altercation. He stated that he asked her whether she was alright and what was happening, and she confirmed that she was fine. *Id*. at 53:23–54:5. He estimated that he was at the party for a total of approximately two hours, and the shove occurred perhaps 30 to 60 minutes after they arrived. *Id*. at 92:2–17. Smith then tried to "keep tabs on" Karlie and Orrostieta for the remainder of the party to confirm there were no additional altercations. *Id*. at 54:14–18. As he was leaving, he sought to confirm that Karlie was alright one last time, and he saw she was dancing with Orrostieta and he "guess[ed] everything [was] good." *Id*. at 58:7–13. He explained, "if they were still arguing, it would have been an issue. But they were dancing and everything seemed all right at that point." *Id*. at 58:17–20.

After the party, Smith met with a friend of Kristen's and told him what he had witnessed, and they decided to go to Kristen's room to tell her what had happened. *Id*. at 61:2–9. Smith testified that Kristen told him, "we thought something was going on between [Orrostieta and Karlie] for awhile," and the group agreed that the next morning, Smith and the friend would confront Orrostieta about his behavior. *Id*. at 61:13–22. Smith testified that Kristen had not told him that she believed Orrostieta had been "abus[ing]" Karlie, and if she had they would have done something "immediately." *Id*. at 62:5–12. Thus, none of these individuals—including the one who saw the altercation—believed that what happened at the party suggested that Karlie was in imminent danger. If the murder was not foreseeable to Smith, who witnessed the entire event and spoke to Karlie about it, or to Kristen, who had at least heard previous incidents between Orrostieta and her sister, it could not possibly have been foreseeable to a Chapter 84 member who would have had, at best, a small fraction of the information known to those two individuals. Certainly, a different set of facts where a Chapter 84 member had witnessed Orrostieta attack Karlie and then

immediately try to leave with her, or a situation where Karlie asked for help (or was so incapacitated that she could not ask for help) could warrant a different result. But given the facts here, even if a Chapter 84 member knew Orrostieta shoved Karlie, Orrostieta's later behavior in beating and strangling her to death was such an extraordinary departure that no one—not Smith, Kristen, or any member of Chapter 84—could have predicted it.

### 3. Existence of a Special Relationship

Alternatively, the plaintiffs argue that Chapter 84 had a duty to intervene because a special relationship existed between it and Karlie. Chapter 84 Opp. at 25–31 "Generally, absent a pre-existing duty, a party cannot be held liable for the criminal actions of a third party. However, in certain situations, a special duty may arise." *McCann v. Miller*, Civ. A. No. 08-561, 2009 WL 4641713, at *2 (E.D. Pa. Dec. 7, 2009) (internal citation omitted). Section 314A of the Restatement (Second) of Torts recognizes four types of relationships that create these special duties: (1) a common carrier's duty to its passengers; (2) an innkeeper's duty to its guests; (3) a possessor of land's duty to members of the public it invites onto that land; and (4) "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection" to "the other." Restatement (Second) of Torts § 314A ("section 314A").

On the one hand, the plaintiffs assert that Chapter 84 was a possessor of land under section 314A(3). Although such a theory of liability could potentially succeed for injuries stemming from the shove at the party (assuming the plaintiffs could show Chapter 84 could have reasonably prevented it, *see* Section 314A cmt. e ("The duty in each case is only one to exercise reasonable care under the circumstances."), the plaintiffs are seeking to impose liability on Chapter 84 for harms that occurred after Karlie left the party. Section 314A does not allow such a result. *See*

Section 314A cmt. c ("Nor is a possessor of land under any such duty to one who has ceased to be an invitee."). That is why the plaintiffs' reliance on *M.L.* is misplaced: in that case, the plaintiff was gang raped on fraternity property by assailants "including members or guests of defendant fraternities." 26 Pa. D. & C.4th at 111. The equivalent here would be if Chapter 84 members participated in her murder at the fraternity party.

On the other hand, the plaintiffs seem to recognize that none of the section 314A categories apply to the harms asserted here, and suggest that "although there are four enumerated special relationships giving rise to a duty of care, the list is not exhaustive and 'there may be other such relations[hips] . . . where the duty is recognized . . . [.]" Chapter 84 Opp. at 28 (quoting Section 314A cmt. b). Unfortunately for the plaintiffs, the one case they cite for this point (*Coath v. Jones*, 419 A.2d 1249 (Pa. Super. 1980)) is in no way analogous to the facts here. In *Coath*, the Superior Court reversed the trial court and held that the defendant employer could be liable for its former employee's sexual assault of its customer, where the plaintiff let the employee into her home because he represented he was there at the defendant's direction. 419 A.2d at 1250–52. The court held that a special relationship exists where the defendant's business requires its customers to admit its employees into their homes. *Id*. at 1251–52. Obviously, Chapter 84 played no role in Orrostieta gaining access to Karlie's dorm room.

### 4.     Duty to Rescue

The plaintiffs also argue that Chapter 84 had a duty to rescue Karlie under Restatement (Second) of Torts Section 322 ("section 322"). Section 322 states,

> [i]f the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm.

Rest (Second) of Torts § 322. Obviously, it was Orrostieta, not Chapter 84, who subjected Karlie to the bodily harm for which the plaintiffs seek damages, namely her brutal strangling death. To the extent the plaintiffs are suggesting that Chapter 84 somehow indirectly caused Karlie bodily harm by providing Orrostieta alcohol, the court has already rejected that argument, and neither of the cases the plaintiffs cite suggest an "indirect bodily harm" theory is somehow viable under section 322 in any event. *See DiTullio v. Pizzo*, Civ. A. No. 89-5673, 1991 WL 129860, *4 (E.D. Pa. July 11, 1991) (holding defendant potentially liable under section 322 for coercing plaintiff into car at gunpoint, engaging in highspeed chase which led to plaintiff being shot, and then delaying taking to her to hospital for desperately needed medical treatment); *Herr v. Booten*, 580 A.2d 1115, 1121 (Pa. Super. 1990) (holding section 322 potentially applies to party who directly caused bodily harm to minor by providing alcohol that caused alcohol poisoning).

### 5.      Restatement (Second) of Torts Section 344

Finally, the plaintiffs mention in passing that "the Restatement (Second) of Torts § 344 [("section 344")] imposes a duty upon a possessor of land to exercise reasonable care to warn against the 'accidental, negligent, or intentionally harmful acts of third persons.'" Chapter 84 Opp. at 30 (quoting *T.A. v. Allen*, 669 A.2d 360, 364 (Pa. Super. 1995)). Section 344 only applies to a possessor of land who holds open his property to the public "for his business purposes . . . ." Rest. (Second) of Torts § 344. The plaintiffs provide no analysis of whether Chapter 84 charging $5 a cup (presumably to cover the cost of alcohol) constitutes a "business purpose," and, in any event, section 344 clearly states that the duty applies "while they are upon the land . . . ." *Id*. There is no dispute that the plaintiffs seek damages for Karlie's death, which did not occur on Chapter 84 property. Moreover, the plaintiffs' argument that Chapter 84 had a duty to warn Karlie about Orrostieta is perplexing, as no one knew more about Orrostieta's violent tendencies than Karlie.

Indeed, the plaintiffs' argument seems to stem from his purported assault on Karlie at the party, but, obviously, Karlie was already aware that that occurred.

### C.     <u>Individual Defendant Nigale Quiles</u>[30]

The plaintiffs do not point to any specific facts that render Quiles uniquely liable for Karlie's death (or even any evidence that he attended the party), but instead state that "a jury could find that [his] [unspecified] conduct, as with all individual members of Chapter 84, substantially aided Orrostieta's consumption of alcohol in this case." Chapter 84 Opp. at 32. Regardless of Chapter 84's overall liability, the court would therefore conclude that these generalized, unsupported claims are insufficient to keep Quiles in the case. Accordingly, Quiles is entitled to summary judgment in his favor on the plaintiffs' claims.

### D.     <u>Millersville</u>

### 1.     Whether Millersville was on Notice that it could Face Title IX Liability for its Response to Harassment by a Student's Guest

The plaintiffs' final cause of action is a Title IX claim against Millersville. Title IX establishes that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX includes an implied private right of action against educational institutions for money damages, *Cannon v. University of Chicago*, 441 U.S. 677, 688–89 (1979), where the institution "had adequate notice that [it] could be liable for the conduct at issue." *Davis Next Friend LasShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("*Davis*"). Whether the institution will be liable depends on whether an institution official "who at a minimum has authority to institute

---

[30] Although the Chapter 84 defendants moved for summary judgment on behalf of Herbine as well, as previously indicated, the parties stipulated to his dismissal on December 7, 2018. Doc. No. 160. As such, the court only discusses the claims against Quiles here.

corrective measures on the [institution's] behalf ha[d] actual notice of, and [wa]s deliberately indifferent to, the [harasser's] misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998). For sexual harassment to amount to a Title IX violation, it must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

The question here is whether Title IX liability applies where the harasser was the student's own guest. The plaintiffs suggest that imposing liability here would not extend Title IX liability but merely "apply the law to a specific set of facts not addressed by [the *Davis* or the *Gebser*] Court[s]." Pls.' Mem. of Law in Supp. of its Mot. Opposing Millersville University's Mot. for Summ. J. ("Millersville Opp.") at 6, Doc. No. 148-1. Millersville, in contrast, argues that the plaintiffs' "claim requires this [c]ourt to establish an entirely new category of Title IX claims." Mem. of Law in Supp. of Millersville University's Mot. for Summ. J. ("Millersville Br.") at 2, Doc. No. 147-1. After a thorough review of the caselaw and regulatory guidance, the court agrees with Millersville that denying summary judgment would require a departure from the established Title IX framework, a departure this court is unwilling to make without guidance suggesting it would be appropriate to do so from the Third Circuit or the Supreme Court.

Under certain circumstances, Title IX liability extends to harassment at the hands of both teachers or other students, but

> [t]his is not to say that the identity of the harasser is irrelevant. On the contrary, both the "deliberate indifference" standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of funding recipients. Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action.

*Davis*, 526 U.S. at 630. The defendant's "substantial" control must extend both to "the harasser and the context in which the known harassment occurs." *Id*.

In extending Title IX liability to include certain student-on-student harassment, the *Davis* Court considered that "the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents." *Id*. at 643. Specifically, the Court identified Department of Education regulations that reference "any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees (34 C.F.R. § 106.31(b)(6)); "education program[s] or activit[ies] not operated wholly by [the] recipient," such as an educational consortia, cooperative employment, or student-teaching assignments (34 C.F.R. § 106.31(d)); a "foundation, trust, agency, organization, or person which provides [financial] assistance to any of [the] recipient's students" (34 C.F.R. § 106.37(a)(2)); "any agency, organization or person [that] mak[es] employment available to any of its students" (34 C.F.R. § 106.38(a)); or contractual relationships the institution enters, such as "employment and referral agencies, . . . labor unions, and . . . organizations providing or administering fringe benefits to employees of the recipient" (34 C.F.R. § 106.51(a)(3)). *Id.* at 664.

The Court also cited to common law, namely Comment *a* to Section 320 of the Restatement (Second) of Torts, which references "teachers or other persons in charge of a public school." *Id.* at 644; Rest. (Second) of Torts 320 cmt. a. Along those same lines, the Court pointed to "state courts routinely uphold[ing] claims alleging that schools have been negligent in failing to protect their students from the torts of their peers." 524 U.S. at 644 (citing *Rupp v. Bryant*, 417 So. 2d 658, 666–67 (Fla. 1982) (failure to supervise extracurricular activity where fellow students hazed plaintiff); *Brahatcek v. Millard Sch. Dist.*, 273 N.W.2d 680, 688 (Neb. 1979) (failure to supervise

physical education class where fellow student fatally struck plaintiff's decedent with golf club);

*McLeod v. Grant Cty. Sch. Dist. No. 128*, 255 P.2d 360, 362–63 (Wash. 1953) (en banc) (failure

to supervise recess where fellow students raped 12-year-old plaintiff). Lastly, the *Davis* Court

noted that Office for Civil Rights materials included "policy guidelines providing that student-on-

student sexual harassment falls within the scope of Title IX's proscriptions" (even though the

guidelines were published too late to have put the defendant institution on notice of potential

liability for a fellow student's misconduct in that case). *Id.* at 647–48.

> These guidelines also reference third parties, but in a similarly limited context:
>
> Sexually harassing conduct of third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a vising athletic club) can also create a sexually hostile environment in school programs or activities. For the same reason that a school will be liable under Title IX for a hostile environment caused by its students, a school will be liable if third parties sexually harass its students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action.

Office for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School

Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034-01 at 12040 (Mar. 13, 1997)

(footnotes omitted).[31]

Contrary to the plaintiffs' argument, it is not just that "this guidance does not specifically

speak to liability for a 'student's guest,'" Millersville Opp. at 7; it is that neither of the examples

are at all analogous to a student's own guest and are inconsistent with the guidelines' reference to

"school programs and activities," as opposed to the school environment more generally. The

---

[31] The revised guidance, which post-dates *Davis*, likewise provides "a visiting speaker or visiting athletes" as examples of non-employee third parties to whose harassment the institution may have a legal obligation to respond. Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 65 Fed. Reg. 66092-01 at 66099 (Nov. 2, 2000). The plaintiffs assert, "[i]t is of course clear that, *inter alia*, [the Office for Civil Rights] determined in the wake of *Davis* that schools needed revised advice with regard to their potential liability for failing to remedy third party harassment." Millersville Opp. at 8. That position is inconsistent with the fact that that the revised guidance does not extend the examples of the sort of third parties over whose harassment the institution may be deemed liable beyond the original examples of a visiting speaker or athlete.

plaintiffs then cite to Millersville's own Title IX Policy, which they assert, together with Millersville's Corporate Designee, Elizabeth Swantek's, testimony, establishes that "Millersville was undoubtedly on notice that their failure to respond to known acts of harassment could create liability under Title IX." *Id.* at 9. But Millersville does not dispute that point. Instead, Millersville argues that although it had notice that it could be held liable for failing to adequately respond to harassment from teachers, fellow students, or third parties whom the University brought to campus (like a visiting speaker or athlete), it did not have notice of liability for this category of harasser, *i.e.*, a student's own guest.[32] The plaintiffs point to no caselaw that disputes this point.

The plaintiffs emphasize that *Davis*, along with the common law and regulatory guidance *Davis* relied upon, puts educational institutions on notice that they may be liable for their response to a third party's harassment. But *Davis* does not suggest that institutions may be liable for the misconduct of *any* third party. To the contrary, the Court held that even in cases involving a fellow student, liability would only attach "in certain limited circumstances." *Id*. at 643. Likewise, the Court referred to liability for "the discriminatory acts of *certain* nonagents," *id*. (emphasis added), not for acts of *any* agent. Thus, the cases and regulatory guidance the Court cited put educational institutions on notice that they face potential liability for the misconduct of their students or other parties whom they play a critical role in connecting with the student, *e.g.*, a work-study program, a student loan agency, or a school-invited athlete or speaker. Neither the regulations nor the caselaw suggest that institutions are responsible for the conduct of a third-party whose relationship with the injured student predates or is otherwise unconnected to the school. Indeed, neither the parties nor the court has identified any case from any jurisdiction in which a court held that Title

---

[32] Like with the general references to "third parties," in the regulatory guidance, the plaintiffs seek to extend Millersville's Title IX policy's general reference to "visitors/third parties" to include a student's guest. Millersville Opp. at 9. But they provide no precedent that suggests a university's own Title IX policy should be read so much more broadly than caselaw or regulatory guidance when the policy itself includes no such indication.

IX applied to a guest whom the university had no role in bringing to campus. Considering that factual background, the court cannot conclude that Millersville was on notice of potential liability for the harassment at issue here.

### 2. Millersville's Actual Notice of Orrostieta's Harassment

That said, if the Third Circuit or the Supreme Court were to extend Title IX liability to cover harassment by a student's own guest, this court would conclude that the plaintiffs here satisfied the other elements necessary to defeat summary judgment. The University argues that no "appropriate person at Millersville had actual knowledge" of the harassment, Millersville Br. at 12, but the evidence creates, at the very least, a disputed issue of material fact about that conclusion.

An appropriate person at the education institution must have "actual notice" of the harassment for liability to attach. *Gebser*, 524 U.S. at 285. That appropriate person is "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.* at 290.[33] He or she "has 'actual knowledge' if [he or she] knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005) (quoting 3C Fed. Jury Prac. & Instr. § 177.36 (5th ed. 2001)). "Actual notice necessitates more than a simple report of inappropriate conduct, however, the standard 'does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.'" *Swanger v. Warrior Run Sch. Dist.*, 346 F. Supp. 3d 689, 705 (M.D. Pa. 2018) (quoting *Escue v. N. OK Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006). To put it differently, "while actual knowledge

---

[33] Although Millersville denies that any University personnel had actual knowledge, it makes no argument that the individuals the plaintiffs claimed to have had knowledge for Title IX purposes would not be qualifying officials under Title IX.

does not require absolute certainty that harassment has occurred, there must be more than an awareness of a mere possibility of the harassment." *Id.* (citing *Bostic*, 418 F.3d at 360).

There are two potential ways that a jury could reasonably find that the University knew "underlying facts indicating" that Karlie faced a "sufficiently substantial danger" from Orrostieta: (1) the altercation in Karlie's dorm room on October 4–5, 2014 and (2) Renea's calls to the University concerning that event. As to the October 4–5 incident, Millersville cites to Wiberg's deposition testimony for the proposition that "Wiberg never saw Karlie with any physical injury indicating that she was hit." Millersville Br. at 11. But Tina testified that she knew that Wiberg saw an injury to Karlie's eye that night because "[Tina] was there." Tina Dep. at 124:5–10. Tina explained that Karlie had tried to hide the injury from Wiberg, "but there is no hiding it when everybody knows. And Karlie, like, rolled over and showed [Wiberg]. I feel like we had an ice pack or something that [Wiberg] got out of our fridge. There was definitely ice that we somehow got for her face." *Id.* at 124:11–20; *see also id.* at 124:5–8 ("[Wiberg] saw Karlie's face the night of the injury."). A reasonable jury could deem Tina's testimony credible and find that Wiberg would not have gotten Karlie ice for her face if she did not realize she was injured. The fact that this injury seemingly appeared while Karlie and Orrostieta were in the room "yelling at each other," *id.* at 56:14–15, during which Tina and Wiberg heard Karlie "scream, 'ow,'" *id.* at 57:2–6; Sara Wiberg Oct. 5, 2014 Incident Reporting Form, would lead any reasonable person to conclude that Orrostieta caused the injury. Thus, the caselaw Millersville cites to suggest Wiberg did not have actual notice here is easily distinguishable. *See* Millersville Br. at 11 (citing *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (holding student's complaints that boys were "bothering her" was insufficient to establish actual notice of sexual harassment); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (holding

school district did not have actual notice where students did not report harassment until after school year ended, and so school could not "be deemed to have 'subjected'" students to harassment); *see also Gebser*, 524 U.S. at 291 (holding complaints about teacher's inappropriate comments in class did not create actual notice of teacher's sexual relationship with student). Accepting Tina's testimony as true, Wiberg knew that Karlie and Orrostieta were fighting, and during that fight Karlie suffered an injury sufficiently serious to require an ice pack. To hold such facts insufficient to create actual notice of domestic abuse would run afoul of common sense.

Next, a jury could find that Millersville had actual notice of the abuse through Renea's reports. Millersville Opp. at 19. Shortly after the October 4–5 incident, Tina called Renea and told her about the fight and that "[Orrostieta] must have struck [Karlie] because she had a black eye." Deposition of Renea Flexer ("Renea Dep.") at 12:19–24, Doc. No. 147-6. Renea then contacted the University Police to ask, "how can we get Karlie help, that she needs to know that she shouldn't be treated like this, and that [Renea] wanted somebody to reach out to her." *Id*. at 18:19–22. Renea testified that she told the police, "you had an incident there . . . and you needed -- for a domestic problem and you've removed [Orrostieta] from the campus. And it ends up that, you know, he did physically abuse her, and she has a black and blue eye -- visible black and blue eye . . . ." *Id*. at 20:10–16. The police told Renea there was nothing they could do unless Karlie contacted them herself but recommended that Renea contact the counseling department at Millersville. *Id*. at 21:8–16. Renea then called the counseling department and described the incident—including that the police needed to remove Orrostieta—but the counseling department also told her that Karlie would have to come to them herself. *Id*. at 24:17–25:7. They also provided Renea with the number for who they said was the head resident assistant. *Id*. at 27:2–4. Renea contacted that individual, whom she identified as "Allie," and again described the incident, including that Karlie was left with a

school district did not have actual notice where students did not report harassment until after school year ended, and so school could not "be deemed to have 'subjected'" students to harassment); *see also Gebser*, 524 U.S. at 291 (holding complaints about teacher's inappropriate comments in class did not create actual notice of teacher's sexual relationship with student). Accepting Tina's testimony as true, Wiberg knew that Karlie and Orrostieta were fighting, and during that fight Karlie suffered an injury sufficiently serious to require an ice pack. To hold such facts insufficient to create actual notice of domestic abuse would run afoul of common sense.

Next, a jury could find that Millersville had actual notice of the abuse through Renea's reports. Millersville Opp. at 19. Shortly after the October 4–5 incident, Tina called Renea and told her about the fight and that "[Orrostieta] must have struck [Karlie] because she had a black eye." Deposition of Renea Flexer ("Renea Dep.") at 12:19–24, Doc. No. 147-6. Renea then contacted the University Police to ask, "how can we get Karlie help, that she needs to know that she shouldn't be treated like this, and that [Renea] wanted somebody to reach out to her." *Id*. at 18:19–22. Renea testified that she told the police, "you had an incident there . . . and you needed -- for a domestic problem and you've removed [Orrostieta] from the campus. And it ends up that, you know, he did physically abuse her, and she has a black and blue eye -- visible black and blue eye . . . ." *Id*. at 20:10–16. The police told Renea there was nothing they could do unless Karlie contacted them herself but recommended that Renea contact the counseling department at Millersville. *Id*. at 21:8–16. Renea then called the counseling department and described the incident—including that the police needed to remove Orrostieta—but the counseling department also told her that Karlie would have to come to them herself. *Id*. at 24:17–25:7. They also provided Renea with the number for who they said was the head resident assistant. *Id*. at 27:2–4. Renea contacted that individual, whom she identified as "Allie," and again described the incident, including that Karlie was left with a

black eye. *Id*. at 29:22–30:13. Again, "Allie" told her that there was nothing to be done unless Karlie reached out herself. *Id*. at 31:8–11.[34]

Renea's testimony reveals a concerned parent (of another student) going out of her way to assist a young woman in need, and encountering resistance from Millersville, until she concluded that her only possible avenue of helping Karlie was advising her daughter to encourage Karlie to seek help. Renea, who certainly owed no legal obligation to Karlie, acted with diligence and compassion to try to help this vulnerable young woman, but Millersville's indifference ensured her efforts were to no avail. Millersville characterizes Renea's repeated attempts to get Karlie help as "speculation—she had heard from her daughter that [Karlie] had suffered injuries from abuse, although [Karlie] had denied any abuse." Millersville Br. at 12. To claim that Karlie denied to Tina that she suffered any abuse—or that Renea reported to University officials mere "speculation"— is a gross mischaracterization of the record.

Tina testified that Karlie told her that Orrostieta "just pushed with the heel of h[is] hand on her eye" and "push[ed] her down into the pillow." Tina Dep. at 61:21–25, 62:8. Millersville seems to suggest that the fact that Orrostieta "just" did these things, as opposed to punching Karlie, means his conduct did not amount to abuse. Millersville SOF at ¶¶ 31, 33, 36. To be clear, a grown man shoving the heel of his hand into a woman's eye socket—hard enough to cause a black eye—is, beyond any shadow of a doubt, just as abusive and horrifying as if he had struck her.[35] Thus, the fact that Karlie may have denied that Orrostieta hit her, Millersville SOF at ¶ 66, is irrelevant and Millersville's assertion that Karlie "never reported to anyone—even her twin sister—that there had been an incident of abuse" that day is patently false. *Id*. at ¶ 32. Tina's undisputed testimony

---

[34] "Allie" likely was Alison Sehl, an area coordinator at Millersville. Pls.' Statement of Add'l Material Facts in Supp. of its Mot. Opposing Millersville University's Mot. for Summ. J. at ¶ 23, Doc. No. 148-2; Renea Dep. at 45:7–24.
[35] Tina and Renea may have speculated that Orrostieta hit Karlie, as opposed to shoving the heel of his hand into her eye, but even if that speculation was incorrect, how Karlie herself described the incident amounted to abuse.

establishes that Karlie reported the abuse to her, which she then shared her with her mother, who shared it with multiple University employees.

Likewise, Tina's and Renea's testimony clearly contradicts Millersville's assertion that "no one saw physical injuries indicative of assault on Karlie in the days after October 5." Millersville SOF at ¶ 34. Tina testified that the injury, which eventually developed into a black eye, lasted "about a week." Tina Dep. at 123:16–18. Karlie tried to hide that black eye, especially from her sister, but Tina clearly saw it, which she reported to her mother who, in turn, reported it to the University. The University is not a court of law, free to disregard hearsay testimony unless it fits within an applicable exception. Renea, through her daughter, presented to multiple University channels credible, specific facts about an incident of domestic abuse on Millersville's campus that was serious enough to give Karlie a black eye. The University already knew, through its own police department and through Wiberg, that the incident on October 4–5 was serious enough that they had to dispatch an officer to remove Orrostieta from campus. Accepting Tina's testimony as true, Wiberg also saw the injury to Karlie's eye, and deemed it serious enough to get her an ice pack. Taking those circumstances together, anyone with this knowledge—including Wiberg, the University police, the University's counseling department, and the head resident advisor— knew underlying facts indicating that Karlie was in sufficiently substantial danger of future harassment from her physically abusive boyfriend. *Bostic*, 418 F.3d at 361.

### 3.     Millersville's Control Over Orrostieta and the Dorm Room

Title IX "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Absent that control, the educational institution would not have "'expose[d]' its students to harassment or 'cause[d]' them to undergo it 'under' the recipient's programs." *Id*. at 645.

Millersville cites to cases concerning students' privacy rights in their dorm rooms generally to suggest that it had no control over what occurred in Karlie's dorm room. Millersville Br. at 8–9 (citing *Bradshaw v. Rawlings*, 612 F.2d 135, 139–40 (3d Cir. 1979), *cert. denied*, 446 U.S. 909 (1980); *Wagner v. Holtzapple*, 101 F. Supp. 3d 462, 473 (M.D. Pa. 2015); *Am. Future Sys., Inc. v. Pa. State Univ.*, 688 F.2d 907, 915 (3d Cir. 1982)). But this case does not ask whether Millersville responding to the abuse would have violated Karlie's privacy rights; it asks whether under the context in which the abuse occurred, the University could have exercised some control to try to prevent its recurrence.

Millersville's argument that "all the harassment and abuse alleged here occurred in the most private circumstances possible—in Karlie's dorm room, late at night, behind a closed door," Millersville Br. at 9, ignores the fact that knowledge of that abuse did, in fact, spread outside the boundaries of that dorm room, through Wiberg's and Officer Liddick's observations and through Renea's call to three separate University channels. Millersville seems to assume that the plaintiffs would need to show that the University had contemporaneous control over the dorm room to prevent Karlie's murder, but the plaintiffs' argument is that Orrostieta never should have been in the dorm room in the first place—either because the University reached out to Karlie or her mother about his domestic abuse earlier or because the University should not have allowed him to bypass the guest check-in process and stay in Karlie's room after the October 2014 incident. Millersville Opp. at 14–15. Indeed, Millersville's Title IX coordinator testified that someone from the University should have contacted both Karlie and Orrostieta in light of Wiberg's incident report. Dep. of Elizabeth Swantek at 130:20–24; 151:2–21, Doc. No. 148-20.

In *Swanger v. Warrior Run School District*, the United States District Court for the Middle District of Pennsylvania described the "control" necessary in a Title IX case to be a "causation

element [which] results in a requirement that harassment, or the likelihood or vulnerability of a student to be subjected to it, must occur subsequent to an official's decision not to remedy a known violation." 346 F. Supp. 3d at 705.[36] Cases outside the Third Circuit lend further support to the idea that what Title IX is ultimately meant to capture is the institution's response—or lack thereof—to a party over which the institution had the power to take some subsequent action. For example, in *Farmer v. Kansas State University*, the district court held that the plaintiff had alleged facts reflecting substantial control over her rapist and the fraternity that hosted the party where she was raped, because the university devoted resources to promoting and overseeing the fraternity, the fraternity was considered a university organization only open to university students, and a university instructor directed the fraternity. Case No. 16-CV-2256-JAR-GEB, 2017 WL 980460, at *8 (D. Kan. Mar. 14, 2017). Whether the university could have entered the fraternity house to prevent the rape while it was occurring was not the issue. *See id.* at *10 ("KSU's next argument— that because it did not have 'contemporaneous control' over the alleged assailant and the fraternity house, it lacked substantial control over the alleged assailant and the context of the sexual assault— is similarly unavailing." (footnote omitted)).

Applying that logic here, it would not be the fact that Orrostieta murdered Karlie on school property that subjected Millersville to Title IX liability. Rather, it would be the fact that the University already knew that Karlie was suffering harassment from the October incident, and— because it did nothing in response—Karlie was subjected to further harassment and, ultimately, her murder. In seeking to limit the question to whether it had the power to contemporaneously

---

[36] Under *Swanger*, Millersville arguably could not have been liable for Karlie's death if it took some steps to respond to the abuse (assuming those steps were not clearly unreasonable), but ultimately failed to prevent the murder. *See* 346 F. Supp. 3d at 705 ("The fact that the appropriate person's initial response does not remedy or prevent the harassment, or that the school does not use a particular method to remedy or prevent the harassment, does not provide sufficient grounds for liability." (citation omitted)). But that defense is premised on the assumption that the institution make some "initial response," which Millersville did not do here.

know of and stop the murder, Millersville, like the defendant in *Farmer*, considers the issue of "control" too narrowly. The plaintiffs have presented evidence that Millersville exercised control over who entered and stayed in its dormitories, including requirements that guests sign in and policies prohibiting a guest from staying in a dorm room for too long or at certain points in the year. The October 2014 incident itself establishes that Millersville's agents, including Wiberg and the Millersville police, had some supervisory authority over what occurred in the dorms. As she did during the October altercation, Wiberg at least seems to have attempted to control the incident by knocking on the door in response to Karlie's neighbors' reports that they had heard banging and furniture being moved. Wiberg Dep. at 129:6–130:2. Wiberg could have continued to knock on the door and, if she still received no response, announce to any occupants that she would call the police (again, as she did in October) if no one opened the door.[37] It would have been more than reasonable to do so considering all the prior events. At the very least, there is a genuine dispute of fact over whether it was within Millersville's or its agents' control to change what happened that night, either by preventing Orrostieta from being in the dorm in the first place or by interrupting the fight that led to Karlie's death.[38]

---

[37] Millersville argues that the October 5 incident "actually demonstrates the limit of [Wiberg's] control" because "Orrostieta had to leave because [Karlie] revoked his permission to be there . . . [and t]here is no indication in the record that she ever did that again." Reply Mem. of Law in Further Supp. of Millersville University's Mot. for Summ. J. at 6 n.7, Doc. No. 151 (citations omitted). The idea that Wiberg could not tell Orrostieta to leave, or at least call the police, when he was strangling Karlie to death because she had not formally "revoked his permission to be there" is patently absurd. It is also directly contracted by the University's own policy, which establishes the procedures by which guests may enter the dorms and limits the number of times they may stay there, regardless of whether the student wishes for them to stay. Dep. of Brian Hazlett at 126:6–17 (discussing Millersville's guest policy), Doc. No. 148-16; *id.* at 148:8–149:18 (same). Certainly, if Millersville could prohibit Orrostieta from staying in Karlie's dorm room more than three days in a row (or from being there over Christmas break, Wiberg Dep. at 136:9–21), it could remove him from being there for actively trying to murder her (or for assaulting her).

[38] Millersville may suggest that it did not, in fact, have control over whether Orrostieta entered the dorm because Karlie would occasionally sneak him in through a back door. Millersville SOF at ¶ 16. They do not claim that is what happened on February 8, 2015, and even if they did, that would go more towards a jury's consideration of whether their response in not trying to ban him from the dormitory was clearly unreasonable, rather than whether they lacked control over him.

4.      **Whether Millersville was Deliberately Indifferent to Orrostieta's Abuse**

The burden that the *Davis* court placed upon educational institutions to address peer sexual harassment was not high: the institution "must merely respond to known peer harassment in a manner that is not clearly unreasonable." 526 U.S. at 649. A genuine issue of material fact certainly would exist as to whether doing nothing in response to evidence that a student is being abused, on campus property, within earshot of her resident advisor, as confirmed by her roommate's mother after the fact, was clearly unreasonable. Millersville's argument that "there were no eyewitness reports of any abuse, and [Karlie] refused to confirm to ***anyone*** that abuse had occurred" contradicts Tina's testimony that she and Wiberg both saw the injury to Karlie's eye (which Tina witnessed develop into a black eye the next day) and that Karlie told her that Orrostieta had pushed the heel of his hand into her eye socket until she had been forced down onto the pillow—an undoubtedly abusive act—all of which the University learned from Tina's mother. Karlie's description of the altercation cannot be reasonably characterized as anything other than a confirmation of abuse. To suggest otherwise would be to minimize the suffering that this young woman endured at her boyfriend's hands, suffering which Renea told multiple University officials about. As Millersville cannot point to anything it did in response to the abuse, there would certainly be, at a minimum, an issue of fact for a jury to decide.

5.      **Whether the Harassment was Sufficiently Severe and Pervasive to Deprive Karlie of her Education**

The fact that a reasonable trier of fact could conclude that Millersville's indifference in the wake of the October 2014 incident subjected Karlie to further abuse—ultimately culminating in her murder—means that, contrary to Millersville's argument, the jury would not be limited to consideration of classes Karlie missed specifically because of the October injury. As the jury could also consider her death, there would no question that they could reasonably conclude that the

harassment was adequately severe. *See Doe v. Pennridge Sch. Dist.*, Civ. A. No. 17-3570, 2019 WL 2011069, at *7 (E.D. Pa. May 7, 2019) (holding reasonable jury could find harassment was sufficiently "severe or pervasive" where plaintiff alleged abusive former boyfriend sent social media threats, stalked, taunted, and physically threated her at school). Therefore, if Orrostieta had been a fellow student, a visiting athlete or speaker, or a third party somehow analogous to those groups, the court would not hesitate to put this case before a jury.[39]

## IV.    CONCLUSION

In the wake of tragedy, it is natural to ask whether someone could or should have done something differently. But it is not for the court to determine whether someone should have taken some action. The court's analysis is limited to whether someone was obligated to do something as a matter of law and whether these particular plaintiffs can obtain relief from these particular defendants for the particular acts at issue here. In this case, there is no evidence that Acacia played any meaningful role in the events that led to Karlie's death. No one at the organization had any way to know about or control the party on February 7–8, 2015, and certainly no one knew that among the partygoers would be an individual capable of murdering his girlfriend. Likewise, the members of Chapter 84—who, indisputably, should not have served alcohol to minors and, in fact, violated the law in doing so—nonetheless could not possibly have foreseen that Orrostieta would leave the party and perform such a heinous, unspeakable act.

In contrast, the Flexers were on notice of the abuse, and they did everything in their power to try to help Karlie. Undoubtedly, they were under no legal obligation whatsoever to do so, but they nonetheless acted with sympathy and compassion in trying to get her help. It is impossible to

---

[39] Millersville also argues that sovereign immunity bars any Wrongful Death Act or Survival Act action. As the plaintiffs acknowledge that wrongful death and survival "are nothing more than a vehicle to recover damages" under Title IX, the court's holding that a Title IX cause of action does not lie resolves this dispute. Millersville Opp. at 26–27.

say what would have happened had Millersville been at all receptive to their attempts. For of all the defendants here, only Millersville knew facts indicating Karlie was in substantial danger and had the power to offer any not clearly unreasonable response. However, considering the relevant judicial precedent and regulatory guidance, the court cannot conclude that the University was on notice of potential liability stemming from this particular category of harasser, namely a student's guest. Certainly, this case could have had an entirely different result if Orrostieta fell into a category of third party whose acts may create Title IX liability. But those are not the facts here, and so the court must also grant Millersville's motion for summary judgment.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.